[Civ. No. 14896. Fourth Dist., Div. One. Dec. 23, 1976.]

In re JAMES M. et al., Minors.
HOMER E. DETRICH, as Director, etc., Petitioner and Appellant, v.
SERGIO M. et al., Objectors and Respondents.

## Counsel

Donald L. Clark, Acting County Counsel, and D. Richard Rudolf, Deputy County Counsel, for Plaintiff and Appellant.

Sandra Joan Morris, under appointment by the Court of Appeal, for Defendants and Respondents.

## Opinion

WHELAN, J.*—Homer E. Detrich, Director of the San Diego County Department of Public Welfare (the Director), has appealed from a judgment dismissing his petition to declare four children free from the custody and control of their natural and legal father.

The children are James M., born October 16, 1963; Daniel M., born April 23, 1965; Deanna M., born April 30, 1968; and Beverly M., born July 21, 1969. They are full brothers and sisters. The two eldest are boys; the two youngest are girls. All were born in San Diego County to Sergio M., their father, and Judith M., their mother, who is deceased.

The judgment appealed from was entered May 22, 1975.

The petition was filed July 21, 1974.

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

The San Diego County Probation Department filed its report in which it recommended the petition be denied, and set forth the reasons for its recommendation.

The matter was determined upon the basis of that recommendation and report, oral and documentary evidence, and a written stipulation as to certain facts, and that certain written reports of psychiatrists, psychologists and others might be considered by the judge as having been properly received in evidence. The truth of the contents of the reports was not in itself stipulated.

The father of the children was brought from the correctional facility to be a witness on his own behalf.

The evidence thus presented, viewed most favorably to the father, was as follows:

Judith Marks (not family name of children anonymously designated herein as "M.") and Sergio were married on October 31, 1962. In 1969, in addition to the four M. children, there were in the household three children of Judith's older brother, one of whom was a foster child for whose care the M.s had a license. Judith's younger sister, Marilyn, had lived with them from 1963 until 1967, when she married. In addition, another foster child lived with them for two years. During those years there was no apparent conflict within the family, which, it may be inferred from the foster home license, was adequately provided for in a well-cared for household.

In July of 1971, Sergio went to Texas with his brother to find a job and a new home for his family. A month later he had found both, but Judith refused to join him as they had planned and he returned to San Diego at once.

From then on there was a series of unpleasant incidents. According to Sergio, Judith gave a liquid to him, which he ingested. In fact it was an attempt at suicide, which resulted in his hospitalization and admittance to Community Mental Health. During the month of Sergio's hospitalization, Judith moved in with Ruben Frederico, with whom she had apparently been having an affair. Upon Sergio's release he found the former home abandoned and stripped of his possessions. He was unable to locate his wife and children. He searched for them, and after three months found Judith in National City. Shortly thereafter, in January

1972, Judith gave the children to Sergio for a visit. Without consulting her, he took them to Texas for a month. Seven days after he left, Judith filed for dissolution of the marriage. Sergio returned with the children to his sister's house, and promptly let Judith know where he was. She arrived with her brother to serve Sergio with restraining orders. While sitting and talking with Judith, Sergio showed her a knife he said he had purchased for James. The Director contends Sergio threatened his wife with the knife, the display of which apparently frightened his niece. Sergio put the knife away when James came into the room. Neither Judith nor James showed any evidence of fear. Judith departed with the children. Sergio became despondent, left the house, and had a rear-end collision with a police car; fled in his car, was arrested and jailed. That also was an ill-conceived suicide attempt. While in jail Sergio was served with the dissolution petition and was brought from jail for his order to show cause hearing on March 20, 1972. Unable emotionally to respond to the judge, he sat mutely throughout the proceedings. On June 1, 1972 an interlocutory decree of dissolution was granted Judith at a default hearing.

The dissolution of marriage decree was not final until September 21, 1972, but, without notice to Sergio, Judith married Ruben Frederico on September 19, 1972.

For some period of time between the entry of the decree and Judith's death on November 10, 1972, Judith played upon Sergio's love for her and led him to believe that they were reconciling. He bought a house for them in both their names, gave her all of his money every time she asked, and bought her a new car. Although he repeatedly begged her to allow him to visit with the children, only a few brief visits were arranged. During those visits, the children told Sergio that Ruben was abusing them by hanging them by their feet, beating them, and shooting at them with a "B-B" gun. Until then Sergio had not suspected that Judith and Ruben were living together.

On the morning of November 10, 1972, Judith's stepfather called Sergio and told him that he was a fool; that Judith had married Ruben Frederico; that she was taking the children to Alaska to join Ruben there; and that she was collecting money from Ruben, welfare and Sergio, and was working as well. In fact Judith and Frederico had taken the children to the Canadian border intending to travel to Alaska but were refused admittance into Canada because of lack of sufficient funds.

Still gullible as to Judith's intentions, Sergio was not convinced by that information. He sought confirmation from Judith. He employed a ruse to get Judith to go with him in his car. He pleaded with her to return to him with the children. She refused. They argued. Still in the car, Sergio threatened her with the knife. He said she directed the knife to her breast. She may have dared him to use it. One of the psychiatrists opined it was the expression of a death wish on her part, for whatever that opinion may be worth. Sergio stabbed her over and over. There were 22 wounds. He was with her when a number of people came to the scene, and gave the knife to one of them.

On June 8, 1973, Sergio pleaded guilty to second degree murder and was sentenced to five years to life. He was found by the trial judge to be in need of psychiatric treatment, and he recommended a minimum term at a facility which would afford treatment, with a long period of parole. Sergio was incarcerated at the California Men's Colony at San Luis Obispo, and remains there to date so far as the record shows.

Sergio's act was considered, by those who knew him and expressed an opinion, to be totally out of character.

From March 26, 1973, when a diagnostic evaluation was done of Sergio at the California Institution for Men at Chino, until November 14, 1974, when the deputy probation officer filed the report in the present proceeding, several evaluations of Sergio were made. Throughout, they noted his remorse and sense of guilt; that he is not an antisocial individual; that he is not violent or delinquently oriented; that he is genuinely concerned for his children; and that his prognosis for success on probation or parole is good. The psychological evaluation done by the Adult Authority on May 7, 1974, indicated there were no contraindications for release. However, parole was denied Sergio on June 12, 1974.

On December 26, 1972, the four M. children were declared dependent children of the Juvenile Court of San Diego County and placed with Alfred and Sue Marks, Judith's brother and sister-in-law. The Marks had been separated, but reconciled to make their home available to the children. In June of 1974, the Marks separated again, and neither was able to care for the children. The children were therefore taken to Hillcrest Receiving Home, where they remained for a month.

The children underwent psychotherapy for approximately six months prior to and during the move from the Marks home, partly to assist them

in adjusting to that move. The numerous evaluations of the children after that time indicated the children did not like living with the Marks and one of the children considered their Aunt Sue Marks to be mean, perhaps because of her disciplinary role.

Sergio's older sister and her husband, Maria and Gus Petropolis, offered a permanent, stable home to the two boys, as their aunt and uncle. "Tia Maria" was James' first choice after his father, and Daniel preferred his father or paternal uncle. The girls apparently made no statement regarding the Petropolises.

The children were placed in two separate foster homes because placement of all four together was not possible. The department of public welfare, adoptions and dependent children's unit workers repeatedly urged Maria Petropolis to adopt her nieces and nephews rather than simply take them into her home. At the same time, from July of 1974 until the time of trial in February of 1975, those same workers did not permit the Petropolises to see the children at all in spite of their repeated requests to do so.

Sergio wrote at least once a week to his sister and usually inquired about the children. Through her he sent them letters and birthday cards that he had made himself, but she was not permitted to deliver them. He had also sent letters through the Marks which were undelivered and to the adoptions worker.

After the six-month therapy for the children, the probation officer did not find any indication that the children should be removed from their father. In September of 1974, the children were evaluated by a child psychiatrist at the joint request of the probation officer assigned to investigate the freedom from custody and control matter, and the Director's welfare worker. The probation officer also interviewed the children prior to her report dated November 14, 1974. Both reports related that the boys remembered, missed and firmly wished to be with their father. The psychiatrist found that the girls intensely wished and needed to be with their brothers, and that it was vital that all four children be placed in the same home. Both recommended that the petition be denied. The psychiatrist's recommendation assumed Sergio's release within a time not too far distant.

On November 26, 1974, the children were evaluated by a psychologist at the request of the welfare worker. She found James, Daniel and Deanna to be in need of psychotherapy to varying degrees.

On December 13, 1974, the annual review of the dependency status of the children was held in the San Diego County Juvenile Court. The matter was continued until March 11, 1975, for a determination of the father's and relatives' rights to visit; and also for the receipt of the August 1974 psychological report on the father and the freedom from custody and control probation report.

On April 11, 1975, Daniel and James were placed by the juvenile court in the home of Maria and Gus Petropolis.

The grounds for the petition were alleged to be:

"II. That said minors were declared dependent children of the court on December 26, 1972 under Welfare and Institutions Code section 600, subsection (a);

"III. That said minor children are presently in the custody of the San Diego County Department of Public Welfare, a licensed adoption agency;

"
. . . . . . . . . . . . . . . . . .

"VI. That said minors have been cruelly treated or neglected by said father; that said parent has been deprived of the custody of said minors for the period of one year prior to the filing of this petition;

"VII. That said Sergio Rolando [M.] plead guilty to and was convicted of second degree manslaughter of his wife under Penal Code Section 192 on June 8, 1973; that said respondent is presently confined at California Men's Colony, San Luis Obispo, California; that as a result of said felony conviction; the said respondent has been deprived of his civil rights and that said felony is of such a nature to prove the unfitness of such parent to have the future custody and control of said minors; that said Sergio Rolando [M.] was denied parole by the Adult Authority in June 1974; that the term of sentence, to wit, the term prescribed by law, five years to life, is of such a length that the minor children herein have been and will be deprived of a normal home for a period of years . . . ."

The findings in support of the judgment are these:

"3. That Sergio Rolando [M.], the father of said minors, pled guilty to and was convicted of second degree murder of Judith Ann [M.], the

mother of said minors, on June 8, 1973, and is presently confined at the California Men's Colony at San Luis Obispo, California.

"4. That due to his involuntary incarceration, Sergio Rolando [M.] has been deprived of the physical custody of the minor children for a period of one year prior to the filing of the petition in this action.

"5. That the felony of which Sergio Rolando [M.] was convicted is not of such a nature as to prove his unfitness as a parent to have the future custody and control of said minors.

"6. That Sergio Rolando [M.] may be released on parole in the near future.

"7. That the minor children have not been cruelly treated or neglected by their father, Sergio Rolando [M.].

"8. That the San Diego County Juvenile Probation Department's report and recommendation for dismissal of the petition herein is supported by the evidence adduced at the hearing on this matter."

Among the conclusions of law is this: "That to serve and protect the best interest and welfare of the [M.] children, the petition to free them from the custody and control of their father should be dismissed."

The Director states his appellate contentions in the following language:

"1. The court erred by purporting to balance the rights of the children against some proprietary interest of the father of the children, in its interpretation of Civil Code section 232, rather than construing its provisions liberally to serve and protect the best interests of the children.

"2. There is no substantial evidence to support the finding that the children have not been cruelly treated or neglected by their father.

"3. There was no substantial evidence to support the finding that the felony conviction was not of such a nature as to prove Mr. [M.'s] unfitness as a parent.

"4. There was no substantial evidence to support the conclusion of law that the petition should be dismissed in the best interest of the children.

"5. The trial court erred in its findings and conclusions regarding cruelty or neglect and both aspects of the felony provision, as a matter of law, and this court should make the appropriate finding and direct the entry of judgment in appellant's favor.

"6. The court erred by failing to make material findings in appellant's behalf.

"7. It was an abuse of discretion and reversible error to deny appellant's motion for new trial."

The questions presented in this appeal are whether it can be said as a matter of law: (1) that a conviction of murder in the second degree is always a felony of such a nature as to prove the unfitness of a parent for the future custody and control of his children; (2) that such a conviction is of such a felony when the victim is the mother of the children, regardless of the circumstances; (3) whether such a killing of the mother, without regard to other circumstances, constitutes cruel treatment of the children, within the meaning of Civil Code section 232, subdivision (a)(2); and (4) whether it must be said as a matter of law, based upon the stipulated facts and the other evidence favorable to the father, that an award of custody to the father would be detrimental to the children, or any of them.

Civil Code section 232, subdivision (a)(2) declares:

"An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:

". . . . . . . . . . . . . . . . . . .

"(2) Who has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, and such parent or parents deprived of his custody for the period of one year prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents.

". . . . . . . . . . . . . . . . . . .

"(4) Whose parent or parents are convicted of a felony, if the felony of which such parent or parents were convicted is of such nature as to prove

the unfitness of such parent or parents to have the future custody and control of the child, or if any term of sentence of such parent or parents is of such length that the child will be deprived of a normal home for a period of years."

"[T]he paramount responsibility of the court in these proceedings [is] to determine what would be best in the child's interests. Section 232.5 states, 'The provisions of this chapter shall be liberally construed to serve and protect the interests and welfare of the child.' " (*In re D. L. C.,* 54 Cal.App.3d 840, 848 [126 Cal.Rptr. 863].)

However, Civil Code section 4600 is applicable in a proceeding to declare a minor child free from parental custody (*In re B. G.,* 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244]; *In re T. M. R.,* 41 Cal.App.3d 694, 704 [116 Cal.Rptr. 292]; *In re Rose G.,* 57 Cal.App.3d 406, 417 [129 Cal.Rptr. 338]).

Civil Code section 4600 provides in part as follows:

" 'In any proceeding where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding or at any time thereafter, make such order for the custody of such child during his minority as may seem necessary or proper. If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to his wishes in making an award of custody or modification thereof. Custody should be awarded in the following order of preference: (a) To either parent according to the best interests of the child. (b) To the person or persons in whose home the child has been living in a wholesome and stable environment. (c) To any other person or persons deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child.

" 'Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child.' "

*In re B. G., supra,* 11 Cal.3d 679, held that an award of custody, to a nonparent on the basis of the parent's unfitness to care for the child must be supported by an express finding that parental custody will be

detrimental to the child (p. 695), and that finding must be supported by evidence showing that parental custody would actually harm the child (p. 699).

Since Civil Code section 4600 declares the priority of a parent to custody of a minor child, except as provided therein, it is not erroneous to speak of the right of a parent to custody, absent the conditions defined in section 4600 that would justify giving custody to another. ■ The conclusion of law that is attacked by the Director is no more than a declaration that the facts adduced would not support a finding the father's custody would be detrimental or harmful. We do not believe it reasonable to interpret the conclusion as recognizing a proprietary or property right in a minor child.

Unless the petition of the Director were to be granted, it was not error to dismiss his petition. The burden was upon the Director to support his petition by evidence sufficient to convince the court that an award of custody to the father would be detrimental to the children. Upon the evidence produced the court reasonably found that the Director's burden had not been sustained.

The juvenile court order depriving the father of custody based upon their dependent status does not afford ground to declare the children free from his custody and control, but is only a condition precedent to such a proceeding. Nor do we consider it necessary to treat at length a theory that the father had neglected the children prior to his imprisonment, or that he treated them cruelly or neglected them, unless those results inevitably followed from the killing of their mother.

■ We are of the opinion the determination of what is in the best interests of the children, and whether it would be detrimental to them or any of them to award custody to the father, must be upon the basis of the circumstances as they exist at the time of the determination, rather than at the time of the filing of the petition or some earlier date (*In re Morrow,* 9 Cal.App.3d 39, 55-56 [88 Cal.Rptr. 142]; *In re Susan M.,* 53 Cal.App.3d 300, 313 [125 Cal.Rptr. 707]).

■ Undoubtedly there may be felonies that, without more, prove a person to be unfit to have the custody of his or her minor children. Such may be crimes that show the depravity of the parent or involve abuse of the child so as to equate the conditions of Welfare and Institutions Code

section 600, subdivision (d), which bring a child within the jurisdiction of the juvenile court. Second degree murder is not necessarily among those.

Undoubtedly, also, the murder of the mother of minor children could be committed by their father in such circumstances as to prove his unfitness. One of the circumstances, certainly, would be if the killing were accomplished in the presence of a child.

■ Here, the trial court might reasonably find that the crime was a crime of passion, not the product of a violent and vicious character, but comprehensible within the framework of human folly, weakness and imperfection.

He might reasonably have found also that the killing did not constitute neglect of the children, although it did deprive them of the care and love of the mother. The concept of neglect in the statute connotes a failure on the part of the neglecting parent in his or her direct relationship with the child. The deprivation of the care of the mother here, by comparison with the deprivation of a child of a familial relationship with one parent resulting from divorce of the parents, is not much greater, considered solely as a deprivation of parental care and guidance.

He might reasonably have found also that the killing of the mother, in the circumstances of her death, was not cruelty practiced upon the children. Within the meaning of section 232, cruel treatment need not be physical; but whether physical or mental, must be intended action or conduct directed to have an effect upon or reaction from a child. Such action or conduct, if negligent or inadvertent, might, of course, fall within some other area of proscribed conduct.

■ We cannot say as a matter of law that at the time of the hearing of the petition the incompleted sentence imposed upon the father, having in mind the possibility of parole, was of such a length that the minor children herein would be deprived of a normal home for a period of years. *In re T. M. R., supra,* 41 Cal.App.3d 694, 702-703, dealt with a mother who, at the time of trial, had been imprisoned for more than two years and was still then imprisoned.

The court did not in terms find that the sentence imposed upon the father was not of such a length that the minor children would be deprived of a normal home for a period of years. The Director did not, prior to the adoption of the findings by the trial judge, or prior to

judgment, request a specific finding on that issue. He did so on his motion for new trial.

The Director recognizes that the finding made by the court that the father "may be released on parole in the near future" was intended as an implied finding that the sentence was not of such length that the children would not be deprived of a normal home for a period of years. Considering that the situation should have been viewed as of the time of decision, the finding made by implication was a finding that the prospective deprivation would not be for a period of years.

Bearing upon what would best serve the interests of the children, the matters that might have been considered by the judge were: that the four children desired to be together; the boys wished to be with their father; a foster parent who would take all four could not be found by the probation department; there was no attempt to show that a single set of adoptive parents could be found for all four; and the question whether, because of the ages of the children, they would adjust successfully in separation to new homes.

The judgment is affirmed.

Brown (Gerald), P. J., and Ault, J., concurred.