[No. F005862. Fifth Dist. May 9, 1986.]

In re TERRY E. et al., Minors.
STANISLAUS COUNTY WELFARE DEPARTMENT,
Petitioner and Respondent, v.
JOHNNETTE R., Objector and Appellant.

COUNSEL

Linda A. Luke, under appointment by the Court of Appeal, for Objector and Appellant.

Michael H. Krausnick, County Counsel, and Harry P. Drabkin, Deputy County Counsel, for Petitioner and Respondent.

Scott W. Williams, under appointment by the Court of Appeal, for Minors.

OPINION

FRANSON, J.—Appellant, who is 35 years old and the mother of Terry E., age 14, Tammy E., age 12, and Daniel R., age 5, appeals from a judgment entered May 31, 1985, pursuant to Civil Code section 232, subdivisions (a)(2) and (4),[1] declaring the minors free from appellant's custody and control and referring the minors to the Stanislaus County Welfare Adoption Agency for adoption. The judgment followed an October 21, 1981, juvenile court finding that the minors were dependent children within the meaning of Welfare and Institutions Code section 300, subdivision (a).[2]

Although the section 232 petition was filed May 10, 1983, pursuant to juvenile court direction, it was not heard until May 15, 1985, because of appellant's appeal of her criminal convictions.

---

[1]Civil Code section 232, subdivisions (a)(2) and (4) reads:

"An action may be brought for the purpose of having any child under the age of 18 years declared free from the custody and control of either or both of his or her parents when the child comes within any of the following descriptions:

". . . . . . . . . . . . . . . . . . .

"(2) Who has been neglected or cruelly treated by either or both parents, if the child has been a dependent child of the juvenile court under any subdivision of Section 300 of the Welfare and Institutions Code and the parent or parents have been deprived of the child's custody for one year prior to the filing of a petition pursuant to this section. Physical custody by the parent or parents for insubstantial periods of time shall not serve to interrupt the running of the one-year period.

". . . . . . . . . . . . . . . . . . .

"(4) Whose parent or parents are convicted of a felony, if the facts of the crime of which the parent or parents were convicted are of a nature so as to prove the unfitness of the parent or parents to have the future custody and control of the child."

All future statutory references are to the Civil Code unless otherwise indicated.

[2]Welfare and Institutions Code section 300, subdivision (a) reads:

"Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] (a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent or guardian actually exercising care or control."

For the reasons to be stated, we conclude that the evidence is insufficient to support the findings required to terminate appellant's parental rights under section 232, subdivision (2) or (4). We reverse the judgment.

### STATEMENT OF FACTS[3]

A. *In general.*

Appellant married Bobby E. July 1, 1969. Terry E. and Tammy E. were born of that marriage August 26, 1971, and November 14, 1973, respectively. Bobby E. was killed in an automobile accident March 20, 1977. Appellant then married Albert R. in July 1979. On August 15, 1980, Daniel R. was born of that marriage.

Albert R.'s parental rights to Daniel R. were terminated in October 1983 based on his guilty plea to charges of having molested Terry and Tammy in June 1981 and his subsequent incarceration as a mentally disordered sex offender (MDSO). Appellant was not involved in the molestations and reported the crimes to the police as soon as she learned of them.

Appellant, however, was involved in sex crimes with other adults September 7, 1981, which resulted in her arrest the following day, her conviction of several felonies and her incarceration in state prison.

All three of the children have been under the protective care of the county since appellant's arrest September 8, 1981. On October 10, 1981, the children were placed in a short term foster home. On May 3, 1982, they were placed in a Fos-Adopt home where they have continued to reside.

B. *Facts relating to appellant's felony convictions.*

According to the victim, Linda, the following transpired. Linda had separated from her husband Ernest in June 1981. On September 7, 1981, Ernest came to Linda's house and took Linda and her five-year-old son Cody to the home he shared with appellant in Modesto, California. They entered the house, and Ernest poured Linda an eight-ounce tumbler of whiskey.

---

[3]These facts are taken from the testimony of witnesses at the section 232 hearing, the juvenile probation officer's report filed June 30, 1983, pursuant to section 233, the supplemental reports of the juvenile probation officer and the orders and documents in juvenile court action Nos. A16888, A16889 and A16890 filed with and received in evidence by the court below.

We also grant appellant's motion of December 11, 1985, that judicial notice be taken of collectively certified documents appended to appellant's opening brief (*People* v. *Preslie* (1977) 70 Cal.App.3d 486 [138 Cal.Rptr. 828]).

Although Linda did not want the whiskey, she drank it out of fear of Ernest. Linda asked to leave, and Ernest told her she was not going anywhere.

Ernest and appellant gave Linda a bottle of wine and told her they were going to cut her hair if she did not drink the entire bottle within three minutes. Linda was unable to finish in the allotted time, and Ernest tied her hands and feet and gagged her. Appellant spread newspapers on the floor and cut Linda's hair until she "was bald." Appellant told Linda she should have cut her throat.

After the haircut, appellant and Ernest carried Linda into the bedroom. They placed her on the corner of the bed and completely undressed her. According to Linda, Ernest got a plastic baton (a nightstick), instructed appellant to hold Linda's legs apart, and he jammed the baton into Linda's vagina. He instructed appellant to place the baton into Linda's vagina, and she complied. Ernest then placed the baton into Linda's rectum, and appellant, at Ernest's direction, did the same.

After appellant removed the baton from Linda's rectum, Ernest told appellant, "we got by with killing your girlfriend and we are going to get by with killing Linda." Ernest told Linda he was going to bind her and throw her in the river. He took the gag out of Linda's mouth and ordered her to orally copulate appellant. Linda vomited during the course of the oral copulation and then passed out. When Linda awoke she was on the bed next to Ernest, and appellant was on Ernest's other side.

The next morning Linda attempted to get up but was hampered by the ties binding her feet. Ernest cut the ties so she could use the bathroom. Upon Linda's return, appellant was lying on the bed with her legs apart. Ernest directed Linda to orally copulate appellant, and she complied when he threatened her with the nightstick. He also forced Linda to orally copulate him.

Later that morning, Ernest was asleep, and Linda asked appellant for a glass of milk. As appellant poured the milk, Linda ran past her and out of the house. Linda ran to the nearby home of Modesto Police Sergeant Ronald Chandler, rang the bell and hid in the bushes. Chandler opened the door and saw Linda, completely naked, hiding in the shrubbery next to the door. As she walked through the doorway she said, "they are trying to kill me." Chandler took Linda into his home, gave her a shirt to wear and called the police. Dr. James Shiobetz, emergency room physician at Scenic General Hospital in Modesto, examined Linda on September 8, 1981. He found uterine, cervical and anal tenderness and an intestinal abnormality consistent with a sexual assault involving blunt objects.

At her trial, appellant testified in her own behalf. She did not deny the events described by Linda, but claimed she acted out of fear of Ernest, her live-in lover. She testified she attempted to aid Linda by initially pretending to cut her hair and by not informing Ernest immediately that Linda had escaped. When Ernest learned of Linda's escape, he grabbed appellant and told her, "so help me God, if you ever tell anybody what happened here I will kill you and I will kill your kids."[4]

On February 11, 1982, after trial by jury, appellant was convicted of violating Penal Code sections 236 (false imprisonment), 288a, subdivision (d) (oral copulation) and 289 (penetration by a foreign instrument), all felonies. The jury verdicts seemed to indicate that appellant was convicted on an aiding and abetting theory and not as a direct participant "as far as the penetration charge." Appellant was sentenced to prison March 16, 1982, for consecutive terms totaling 13 years. This court affirmed the convictions July 25, 1984, but remanded the matter for resentencing because of the trial court's failure to state reasons for the consecutive sentences. On January 17, 1985, after a new probation report was filed which indicated that appellant may not have participated in the nightstick incident, appellant was resentenced to a term of nine years.

Appellant's coparticipant in the sexual orgy, Ernest, was acquitted by a jury in a separate trial. His defense was that his wife Linda had initiated and consented to the sexual encounters on the evening in question; that she was bound and gagged as part of a sexual adventure which she had requested. The jury apparently accepted this defense.

C. *Facts relating to cruel treatment or neglect.*

In December 1980, a referral was made to the Stanislaus County Child Protective Agency alleging that appellant was neglecting and failing to

---

[4]In an interview with a probation officer after her trial, appellant amplified on the events of September 7, 1981:

"My co-defendant brought his wife to my house. We were drinking & talking when he became violent towards his wife. He kept telling her that she had taken 2 yrs. out of his life because she sent him to prison. And now she was going to pay for it. He threatened to kill my children & myself if I didn't cooperate with him. He also threatened to do the same things to me & kill me if I ever told anyone what happened. I didn't want any harm to come to me or my children so I did what he instructed me to do. He took a night stick & inserted it into her vagina & anus, during which time I was sick in the bathroom. I knew that he was sticking the night stick into her but I did not participate in doing this part of my charges. I did cut her hair & participated in letting her oral copulate me, only because my co-defendant threatened me into participating in these acts. It was just as much against my will as it was again his wifes. I do want to take a polyagraph [*sic*] test as to my participation during this whole incident.

"I'm going to appeal the decision of the Jury. I'm not guilty & I want to prove my innocense [*sic*]. The reason Linda [C.] is saying these things as far as my participation in this crime, is because her husband Ernest [C.] told her at the time that I was pregnant with his child."

supervise her children. Social workers investigated the matter, "admonished appellant," and the matter was terminated.

After appellant's arrest on September 8, 1981, social worker Howard Lower investigated the condition of appellant's house in which the children had resided. Photographs introduced into evidence depicted clothing strewn about the house, food on the floors and fecal matter smeared or dropped about the home. The fecal matter was believed to have been that of an animal. Daniel's room was littered with dirty diapers and smelled strongly of urine. At the time of appellant's arrest, Daniel was wearing fecal and urine stained diapers. He was described as "very filthy" and "very dirty" and suffering from "fairly severe diaper rash." Mr. Lower testified that the living room smelled of "fecal matter and old stale food." Save for the bathroom, which apparently had been recently cleaned, the home "was just in general an unkempt condition and not healthy for the children."

Appellant testified that at the time of her arrest there were no clothes strewn about her house, there was no fecal matter on the floors and that her house was not in such disarray as Mr. Lower described and the photographs portrayed.

Sonja Ross, appellant's mother-in-law (the grandmother of Terry and Tammy), testified that she visited appellant approximately twice a week over a six-month period until about two weeks before appellant was arrested. She said that the house was "always very clean," and although appellant was not a meticulous housekeeper, she was adequate. John Ross, appellant's father, testified that he had visited appellant's home approximately two weeks before her arrest and perceived the home to be "clean" and the children well taken care of.

Peggy Fann, appellant's sister-in-law by her first marriage who sought custody of the children when she learned of their problems, testified that she believed appellant was "very lacking" in her abilities as a mother and needed "a lot of help." She further testified that appellant was "not ready" for parenting responsibilities.

One other act of cruelty or neglect by appellant toward her children arguably occurred the night of September 7, 1981, when appellant involved herself in the sex acts against Linda. Her children were in their bedrooms and heard the moans and other noises. They apparently saw Linda at one point when she was bound and naked to the waist.

D. *Facts relating to children's emotional and mental condition and their relationship to their mother.*

The juvenile court dispositional report dated October 21, 1981, states that Terry and Tammy said "they loved their mother and . . . they would

like to live with [her] again." Tammy was quoted as telling the social worker "I love my mom and dad. I want to go back to live with them. . . . Tell my mother that I love her." Terry reportedly said "I want to go back to my mother. I still want my dad back. We want to live with him again." Daniel was too young to make a statement. The dispositional report included a "reunification plan" which provided that appellant, upon release from incarceration, shall: (1) maintain a stable home environment in which her house is clean with adequate furnishings and food; (2) successfully complete a parenting skills program and be evaluated by a psychiatrist or psychologist; and (3) successfully complete any counseling program which the doctor indicates is needed. Appellant was still confined in the county jail awaiting disposition of the criminal charges at the time the dispositional report was prepared.

During appellant's incarceration, she had three visits with her children. The September 21, 1983, juvenile court review report stated that the visits between appellant and the children went well and concluded that the children had a good relationship with their mother. However, the March 2, 1983, semiannual court review noted that during a visit with their mother "Tammy was in constant motion, whirling around the room, Terry was reserved but did talk to his mother." The foster parents reported that the children went downhill after this visit with their mother.

Three of the social workers who testified discussed the reactions of the children during visits with appellant. Virginia Wilson, who had taken the children to visit appellant in jail on at least one occasion, apparently was unaware of any adverse reactions. Riva Burchett, who also had taken the children to visit appellant on at least one occasion, testified that Terry was "disgusted about the whole thing." He said, "I'm going to be 19 and grown, you know, before my mother gets out of jail." Peggy Keene testified that the children appeared "very uncomfortable" when they visited appellant in jail. "It was a very difficult situation visiting with their mother in a small visiting cell at the women's facility and after the initial questions about how they were doing was over then they became very restless."

When asked about their foster home, Terry and Tammy stated that they wanted to stay. According to the March 2, 1983, report, "[b]oth Terry and Tammy have stated that they want to become permanent members of the foster family."

The March 2, 1983, report concluded that the children's physical health was good. However, there was concern about the children's emotional health. When evaluated, both Terry and Tammy showed signs of severe

cultural deprivation and high levels of anxiety. Both children were in therapy, and Tammy was being treated for her hyperactivity.

Numerous professionals testified regarding the emotional health of the children. The consensus was that the children suffered from emotional and behavorial problems. Psychiatrist Robert Schorr opined that "it appeared" that the children's problems were the result of prior abuse and neglect. He related the severity of their disturbances, especially as to Tammy, "to early childhood problems being abused sexually [by her stepfather], probably not being nurtured and reasonable enough environment that would give her the stability she needs." He further stated that the children's behavior and emotional symptoms are manifestations of their very disrupted and unstable lives. The children "are feeling some loss, disappointments, sadness, anger, resentment" over the loss of their mother. "Their lives have been very disrupted, very unstable. A lot of these behaviors and emotional symptoms are manifestations of that."

Both Dr. Schorr and psychologist Barry Olson expressed the opinion that the children should not be returned to appellant. Dr. Olson believed that the detriment that would result would be from taking the children from their "now stable environment" with the foster parents rather than from placing them with appellant. However, Dr. Schorr felt that the children should be removed from the custody and control of appellant "as soon as possible." Dr. Schorr stated that Tammy and Terry reacted adversely to even the thought of returning to or contacting appellant.

Child counselor Sandra Schneider testified that although Tammy gets extremely upset when she talks about her earlier years and the molestations by her stepfather, Albert, she does *not* indicate a fear of her mother; that she would like to see her "Mom" when "she's in her 20's." The social worker suggested this would be a good time to start thinking about her mother.

Appellant corresponded with the children and sent gifts at Christmas. Apparently, the children reacted adversely to either correspondence from their mother or discussions concerning her. Due to the children's negative reactions, a decision was made to terminate all correspondence with appellant. No letters or gifts received from appellant were delivered to the children after around March 1984. When Tammy inquired about not hearing from her mother after a holiday, the children were told that their mother was still writing to them but "it was being held for them until the time when they could handle it better." The children "seemed to accept the decision very well." The children also were never told that appellant's release date from prison had been changed from 1990 to July 1986. Appellant

continued to write to her children on a regular basis. She was not told that her letters, cards and presents were not being delivered to her children.

The probation officer's report filed June 30, 1983, following the filing of the petition to have the children declared free from appellant's custody, states that Terry advised the officer concerning his mother "She's nice and all that, but I would have a problem talking about [her]." Terry would "miss her a little bit," but felt he would be better off with his foster family. Terry also stated he would not mind if they allowed him to see his mother again. He would like to be in court for the hearing on this matter. Tammy advised the officer that she would not mind seeing her again as "she is nice and we haven't seen her in a long time." Tammy stated that it did not really matter whether she was present for the court hearing.

E. *Facts relating to relatives.*

In October 1982, appellant wrote to the welfare department asking that an aunt of Terry and Tammy's (Peggy Fann) be given legal guardianship of the children. In January 1983, the Fanns had their attorney write asking for custody of the children.

Peggy Fann (age 45) is the sister of appellant's first husband Bobby E. (Terry and Tammy's father) who was killed in an automobile accident in 1977. Russell Fann (age 47) is retired from the Navy and owns a successful trucking business. The Fanns live in Armona (Kings County), California. The Kings County Department of Social Services was asked to conduct an evaluation of the Fanns as to their suitability for custody of the children. On March 28, 1983, a written evaluation was received which showed that the Fanns were sincerely motivated toward caring for the children. They wanted to be appointed guardians for the children and were willing to assume the responsibilities of the child care involved. The report concluded: "Mr. and Mrs. Fann have displayed they want the three children. They appear capable as parents but may need some social service support in dealing with the children's emotional problems. They are quite willing and able to seek out any professional help that may be required in the care of these children. Mr. and Mrs. Fann have successfully raised three children as evidenced by the fact they are all living on their own and fully self-supporting. . . . Mr. and Mrs. Fann seem to be realistic in their attitude toward these children. They are considered to be reasonable, stable people. Mrs. Fann is very emotionally involved in the legal aspect of obtaining these children. She is very sensitive about being viewed as a good alternative for the children. While Mr. Fann is involved, he is not emotionally biased. He seems to have a good understanding of what is going on legally, and feels the Court will make a decision with the children's best interest taken to heart. *It is our*

*opinion the Fann's would have little difficulty in providing a good, stable home for the involved children."* (Italics added.)

The social workers concluded, however, based on the psychologist's opinion and their own observations that any move from the foster home "at this time" would be "disastrous" to the children, especially Tammy. Also, "The minors have expressed a desire to remain in their current home."

Dr. Olson wrote a letter to Peggy Keene, social worker, dated February 28, 1983, wherein he concluded, "It is a gross disservice to these children to consider visitation with other relatives or guardianship by other family members given the psychological trauma these children are currently suffering. At the time, they are in the best possible situation and they need the consistency they are now experiencing." Dr. Olson, however, never talked to the children about visiting their relatives.

Peggy Fann did not hear about the children's problems until approximately one year after appellant was arrested. At that time she and her husband decided to contact the welfare department and see what they "could do to help." The social worker's response to Mrs. Fann's first contact was "basically at this time we don't want the children disturbed *by family."* (Italics added.) When she asked the caseworker why family was not contacted or why they did not find out if there was any family available for these children, Mrs. Fann was first told that appellant did not want the family to know about it. Mrs. Fann finally contacted appellant by telephone, and shortly thereafter she and her husband decided to seek custody of the children. According to Mrs. Fann, "children belong with family." She testified that she received no response to her request to visit the children, to make contact with the children, or to let the children know they had family available.

Mrs. Fann said she contacted caseworkers by telephone many times, but the caseworkers were evasive and refused to give her any information regarding the children.

Mrs. Fann testified that she was allowed to see the children only once. She stated that Terry was friendly but quiet and that she and Tammy talked "about everything." The meeting lasted about two hours, and Mrs. Fann walked out of the meeting holding the two younger children's hands.

Mrs. Fann testified that she and her husband raised three children, and they have two grandchildren. Mrs. Fann and her husband were anxious to give the children a home and to do their best for them. She believed that she and her husband could handle the children even with their psychological problems.

*F. Facts concerning appellant's fitness to have the future custody and control of her children.*

Appellant does not have a significant history of substance abuse nor does she have a criminal record apart from the felony convictions heretofore discussed. Appellant is apparently in good health although she acknowledged to the probation officer that she had received mental health counseling in 1977 "when I went into a state of manic-depression when my [first] husband died."

Appellant testified that she is currently incarcerated at the California Institution for Women in Frontera; that she has been confined since September 8, 1981, and her release date is July 9, 1986 (slightly over a year from the date of the section 232 hearing); however, there is a possibility that she could get work furlough by April 1986.

While incarcerated she divorced Albert R., and a certificate of dissolution of that marriage was introduced into evidence.

Appellant testified that she had actively participated in an "effective parenting and child care" course at prison and in a new "reunification program" that had just begun there. The effective-parenting class went into great depth about raising children from birth to adulthood. It was a twelve-week course, three hours per day, five days a week. The course involved lectures, films and group discussions. It was designed to promote better parenting when incarceration ended. Appellant received a certificate of completion of the course which was received in evidence.

Appellant had been led to believe that her children had received all letters, cards and gifts from her.

She testified that the welfare department had never contacted her at any time during her incarceration concerning any plan for reunification with her children. Nor did anybody from welfare ever contact her regarding her preferences for placement of the children with family members or with regard to religion "or anything of that sort." Appellant expressed her wish that Peggy and Russell Fann be appointed legal guardians of her children with the ultimate plan that appellant would eventually be reunited with her children.

Appellant had discussed with the Fanns their guardianship of the children. The Fanns had told her that upon her being released, she would *not* be able to get the children back until "they felt that I was stable enough to receive

the children." Appellant repeatedly expressed her love for her children and her desire to eventually reunite with them.

Appellant also testified that she had counseling with the psychiatrist in prison in stress management therapy group sessions; that she had completed the sessions to better qualify her for ultimate reunification with her children.

Appellant testified that the only visitations she had with her children were at the Stanislaus County facility in a small holding cell with a social worker present. It was very difficult to communicate with the children under these circumstances. She said she was "afraid of mentioning the wrong thing because I am highly concerned about their reaction, you know, to my incarceration and what is going on and I also did not want my visitation suspended."

Correctional counselor Robert Pope of the California Institution for Women at Frontera forwarded to the court a report on appellant's conduct in prison. In summary, Mr. Pope indicated that appellant had "performed an excellent program while at CIW. She has done well in all of her job assignments, which include landscaping, clerical work for the shipping and receiving department, as well as with the program administrator's office. She has also participated in parent effectiveness and child caring courses and participated regularly in a stress management course. [Appellant] has performed well in all areas of her prison program. Mr. Pope indicates that appellant has received no 'writeups' or other disciplinary actions. . . . If all inmates were like [appellant] he could 'go home.'"

Appellant has received her general education degree while in prison.

## DISCUSSION

I. *Nondeterminative[5] but disturbing factors.*

The welfare department's failure to explore placing the children with relatives such as Mr. and Mrs. Fann back in 1981 and 1982 when the children were declared dependents of the juvenile court and put in successive foster homes is most disturbing. Although appellant had asked in October 1982 that the Fanns be appointed guardians of her children, it was not until March 2, 1983, that the juvenile court ordered an evaluation of the Fann home. These facts suggest a department "mind set" to place appellant's children for foster parent adoption as soon as possible.

---

[5]We are reviewing the section 232 termination judgment and not the juvenile court dependency and permanent planning orders under Welfare and Institutions Code sections 361 and 366.25.

Welfare and Institutions Code section 362, subdivision (a)(1) clearly implies that when the juvenile court orders removal of a child from the physical custody of his or her parents, the child should be placed, if at all possible, in the home of a relative, provided only that the relative's home is suitable for the child. (See also Welf. & Inst. Code, § 281.5, which directs that primary consideration be given to placing the minor with a relative if it "is in the best interests of the minor and will be conducive to reunification of the family.") Rather than exploring this possibility, the welfare department proceeded to place the children in successive foster homes culminating with the present Fos-Adopt parents in May 1982. By the time of the section 232 hearing in May 1985, the children, as expected, had established a good relationship with their foster parents just as they presumably would have established with the Fanns if they had received custody of the children early in the game.

Severing the parental relationship should be the least detrimental alternative for the child. (*In re Carmaleta B.* (1978) 21 Cal.3d 482 [146 Cal.Rptr. 623, 579 P.2d 514].) Failing to explore placing the children with guardian relatives such as the Fanns at the very outset of this case appears to violate this rule.

██ Another disturbing factor is the failure of the welfare department to offer any realistic reunification services to appellant and the children. The reunification plan required by Juvenile Court rule 1376 and Welfare and Institutions Code section 361, subdivision (f)(1) "'is a crucial part of a dispositional order which removes any child from the home.'" (*In re John B.* (1984) 159 Cal.App.3d 268, 275 [205 Cal.Rptr. 321].) In *In re John B., supra,* the court found that a reunification plan was required even though the natural mother had exhibited an extensive history of psychiatric problems which included criminal activities and refusal of psychiatric treatment and loss of her three older children. Nevertheless, the court looked to the legislative intent of the statute and concluded that intensive support services to reunify families should begin immediately and that at the six months' status review, if it appears *impossible* that return will take place, then a permanency planning hearing may be had. The statutes have as their purpose reuniting the family. (*Id.,* at p. 275.)

In the present case, the dispositional reports attached to the probation officer's report indicate that no reunification efforts were actually made by the welfare department other than allowing the children to visit their mother on three occasions, the last being September 1982. It was shortly after this visit that the welfare department concluded that a reunification plan was "not feasible" because of appellant's thirteen-year maximum term sentence (six and one-half year actual incarceration assuming full work and conduct

credits) and recommended eventual adoption of the children. Later, by cutting off letters, cards and gifts to the children, the department terminated any possible contact that appellant could have with her children.

Respondent's argument that reunification efforts were not feasible because of the mother's long-term incarceration simply does not wash. Appellant's felony convictions were not final when the department abandoned its reunification efforts. Since the court had no jurisdiction to entertain the section 232, subdivision (a)(4) petition or to terminate appellant's parenting rights because of the felony convictions until the convictions became final (*In re Sonia G.* (1984) 158 Cal.App.3d 18, 23-24 [204 Cal.Rptr. 498]), the decision to end the "reunification plan" was premature to say the least. Although appellant's convictions were not reversed on appeal, the sentence was eventually reduced to nine years with a projected release date for July 1, 1986, four and one-half years after appellant's commitment to prison.

It is most ironic that appellant has performed her part of the department's originally proposed reunification plan which included parenting classes and psychological counseling as well as continuing contact with the children to the best of her ability. As appellant argues, if she had received any help from the welfare department in maintaining contact with her children, she probably would have a good relationship with her children today. Even if the children had remained with their foster parents as guardians, a reunification plan might have been entirely workable during the four and one-half years of appellant's incarceration.[6]

---

[6]The Legislature has recently added subdivision (f) to Welfare and Institutions Code section 361 concerning child welfare services to be provided to the dependent child and his parents or guardians and ordered by the court:

"If the parent or guardian is incarcerated or institutionalized, reasonable services may include, but shall not be limited to, all of the following:

"(A) Maintaining contact between parent and child through collect telephone calls.

"(B) Transportation services where appropriate.

"(C) Visitation services where appropriate.

"(D) Reasonable services to extended family members or foster parents providing care for the child if the services are not detrimental to the child.

"An incarcerated parent may be required to attend counseling, parenting classes, or vocational training programs as part of the service plan if these programs are available.

"(2) Services need not be ordered when the court finds, by clear and convincing evidence, any of the following:

". . . . . . . . . . . . . . . . . .

"(B) That the parent is incarcerated or institutionalized and the court finds that the resources or policies and procedures of the facility do not permit the provision of the services.

". . . . . . . . . . . . . . . . . .

"When a parent is released from incarceration or institutionalization, the court shall order the probation officer to provide family reunification services in accordance with this subdivision. . . .

". . . . . . . . . . . . . . . . . . ."

This legislation shows the public policy favoring reunification even though a parent is

II. *The insufficiency of the evidence to support the findings required to terminate appellant's parental rights.*

■   The right of a mother to raise her own children is so fundamental that the termination of that right by state action must be viewed as a drastic remedy to be resorted to only in extreme cases. (*In re Carmaleta B., supra,* 21 Cal.3d 482, 489.) It also must be found that severing the parental relationship "becomes the least detrimental alternative for the children." (*Id.,* at p. 489.) For these reasons, there must be *clear and convincing* evidence of the facts necessary to declare the minor free from the custody and control of the parent. (§ 232, subd. (c); *In re Angelia P.* (1981) 28 Cal.3d 908, 918 [171 Cal.Rptr. 637, 623 P.2d 198].) This "requires a finding of high probability. . . . [It requires] that the evidence be '"so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind."'" (*In re Angelia P., supra,* 28 Cal.3d at p. 919.)

■   Although we are required to affirm the judgment in a section 232 case if there is any *substantial* evidence to support the trial court's findings, in making this determination we must decide if the evidence is reasonable, credible and of solid value—such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. (*In re Angelia P., supra,* 28 Cal.3d at p. 924.)

A. *Cruelty or neglect under section 232, subdivision (a)(2).*

■   The basic defect in the findings of cruelty or neglect justifying the termination of appellant's parental rights is the absence of proof that the factors which gave rise to the cruelty or neglect in 1980 and 1981 still persisted at the time of the section 232 hearing in May 1985. (*In re Susan M.* (1975) 53 Cal.App.3d 300, 313 [125 Cal.Rptr. 707].) As explained in *In re Carmaleta B., supra,* 21 Cal.3d at page 493, "[A]n order to free a child from parental custody and control must rest on *present circumstances* as well as past acts although such prior acts are evidence which may be considered by the court in deciding whether there is sufficient showing to justify the [severance] order." (Italics added.) Although appellant may be precluded by reasons of collateral estoppel from denying the truth of the findings of the dependency proceeding that she was incapable of exercising care or control over her children (Welf. & Inst. Code, § 300, subd. (a)), appellant nonetheless was "'entitled to have the circumstances leading to the [dependency] order[s] reviewed in the light of subsequent events,'" and

---

incarcerated unless the court finds by clear and convincing evidence that the "resources or policies or procedures of the facility do not permit" the furnishing of the services. We doubt that such finding could have been made in the present case.

to determine "'. . . whether *the conditions which gave rise to the . . . neglect still persisted*'" at the time of the section 232 hearing. (*In re Carmaleta B., supra,* 21 Cal.3d at pp. 493-494, quoting from *In re Morrow* (1970) 9 Cal.App.3d 39, 56 [88 Cal.Rptr. 142], italics added.)

We conclude that no reasonable trier of fact could find by clear and convincing evidence that the conditions which gave rise to appellant's cruelty and neglect of her children in December 1980 and September 1981 still existed in May 1985 when her parental rights were terminated. To the contrary, the only evidence relating to appellant's ability to properly care for her children in May 1985 was that appellant had been rehabilitated during her three years and eight months of incarceration. She had received extensive counseling on her parental duties and on stress management. She was a model prisoner and was sincerely motivated to become a good mother for her children. No contrary evidence was presented by the welfare department; all of the department's evidence related to the need to avoid any disruption in the children's living arrangements with the foster parents. That evidence is not sufficient to justify the termination order. (*In re Carmaleta B., supra,* 21 Cal.3d 482; *In re Angelia P., supra,* 28 Cal.3d 908, 919; *In re Susan M., supra,* 53 Cal.App.3d 300, 313; *In re Morrow, supra,* 9 Cal.App.3d 39, 55-56, overruled on other grounds in *Hollister Convalescent Hosp., Inc.* v. *Rico* (1975) 15 Cal.3d 660, 674 [125 Cal.Rptr. 757, 542 P.2d 1349]; *In re Gano* (1958) 160 Cal.App.2d 700 [325 P.2d 485].)

B. *Felony convictions under section 232, subdivision (a)(4).*

■ To support a termination of appellant's parental rights based on her felony convictions under section 232, subdivision (a)(4), a trier of fact must find that "the facts of the crime . . . are of a nature so as to prove the unfitness of [appellant] to have the *future* custody and control of [her children]." (Italics added.) This section also concerns itself with the *current* parent-child relationship. ■ As explained in *In re Michele C.* (1976) 64 Cal.App.3d 818, 822-823 [135 Cal.Rptr. 17]—in rejecting the contention that section 232, subdivision (a)(4) is unconstitutional because it permits the state to terminate a parent's legal relationship with his or her child solely because of a criminal conviction—the statute must be read and harmonized with section 4600 which requires that before the court can make any order awarding custody to a nonparent, without the parent's consent, it shall make a finding that an award of custody to a parent *would be* detrimental to the child and the award to a nonparent *is required* to serve the best interests of the child. "Read together," the two statutes "do concern themselves with 'the current parent-child relationship or the *present* fitness of the parent.'" (64 Cal.App.3d at p. 823; cf. *In re Arthur C.* (1985) 176 Cal.App.3d 442, 445 [222 Cal.Rptr. 388].) ■ This of course makes

sense. The fact that appellant engaged in depraved sex acts toward the victim Linda during the night of September 7, 1981, while Linda's and appellant's children were in the house does not foreclose inquiry three and a half years later at the section 232 hearing as to whether appellant had rehabilitated herself so that she would no longer be unfit to have the custody and control of her children. (See *In re James M.* (1976) 65 Cal.App.3d 254 [135 Cal.Rptr. 222] and *In re Gary U.* (1982) 136 Cal.App.3d 494 [186 Cal.Rptr. 316] holding that seriousness of crime and length of sentence alone do not support severance of parental rights.) Again, the evidence showed that as of the date of the section 232 hearing appellant had spent three and one-half years in prison for her crimes, she had received extensive parenting and psychological counseling to improve her fitness as a parent, she had continuously expressed her love and concern for her children and desired to be reunited with them upon release from prison which would occur about one year from the date of the hearing. Appellant had complied with all of the conditions of the reunification plan that were within her power to satisfy. She had been a model prisoner. Moreover, appellant had no prior criminal record nor was there any evidence that she had engaged in any acts of sexual perversion other than the crimes of September 7, 1981. Again, the welfare department presented no credible, solid evidence to rebut appellant's proof that she would be able to properly care for her children upon her release from prison.

Several cases upholding severance of parental rights because of felony convictions illustrate the type of evidence required to prove future parental unfitness. In *In re Sarah H.* (1980) 106 Cal.App.3d 326 [165 Cal.Rptr. 61], the father had administered a fatal beating to the mother in the presence of the children and had killed a man in a bar four months later. A diagnostic study and the probation reports for the two homicides indicated that alcohol-induced violence was consistent with the father's character. He had two previous criminal convictions associated with the excessive use of alcohol. "Given this and the circumstances of the mother's death, the trial court could reasonably conclude that the probability of recurrence of alcohol-induced violence by [the father] posed a threat to the children's mental and/or physical well being should be regain custody." (106 Cal.App.3d at p. 330.)

In *In re Geoffrey G.* (1979) 98 Cal.App.3d 412 [159 Cal.Rptr. 460], the majority of the court upheld the termination of the father's parental rights where the evidence showed the father had violently strangled the mother after having consumed a substantial amount of intoxicants the night before. The father had a long-established drinking problem and a criminal record showing numerous arrests and convictions for intoxication. The father did not support the child although earning $600 net per month and had seldom

communicated with the child while in prison. "All of these factors are indicative of serious personality flaws and emotional instability." A strong dissenting opinion argued that the facts did not show a felony conviction of such a nature as to prove the unfitness of the father to have the future custody and control of his child.

In *Adoption of D. S. C.* (1979) 93 Cal.App.3d 14 [155 Cal.Rptr. 406], evidence that the armed burglary for which the father was convicted with his 17-year-old wife as an accomplice was but one of a series of burglaries in which the couple engaged to better their standard of living and that during the crime the father carried the gun in violation of parole, was held sufficient to render the father unfit to be a parent to the child born by his young wife. "From these facts, the trial judge could reasonably have inferred that defendant had a propensity to violent crime, that he did not hesitate to involve family members of a tender age in crime, that he would turn to crime in the future should he find difficulty in making a living, and that he might violate parole and thus place himself in jeopardy of being taken from his family and returned to prison." (93 Cal.App.3d at p. 25.)

In *In re James M., supra,* 65 Cal.App.3d 254, the trial court dismissed a section 232, subdivision (a)(4) petition to declare four children free from the father's control although the father had been arrested and convicted of second degree murder of the mother. The father had stabbed the mother to death following a marriage dissolution granted to the wife and his rejected plea that she return to him with the children. The appellate court affirmed, noting that the second degree conviction did not as a matter of law render the father unfit to be a parent in the future. "Here, the trial court might reasonably find that the crime was a crime of passion, not the product of a violent and vicious character, but comprehensible within the framework of human folly, weakness and imperfection. . . . [¶] We cannot say as a matter of law that at the time of the hearing of the petition the incompleted sentence imposed upon the father, having in mind the possibility of parole, was of such a length that the minor children herein would be deprived of a normal home for a period of years." (65 Cal.App.3d at p. 266.)

In all of the cited cases where parental rights were severed, the trier of fact could objectively find a reasonable probability that the conditions, i.e., the criminal disposition of the parent which gave rise to the felony convictions would continue in the future to render the parent unfit to care for the child. (Cf. *In re Mark V.* (1986) 177 Cal.App.3d 754 [225 Cal.Rptr. 460].) In the present case, we find no such evidence.

Respondent's argument that appellant's earlier marriage to Albert and his molestation of her two older children and appellant's occasional use of

marijuana and one use of "crank" and "mushrooms" with Ernest between July and September 1981 coupled with appellant's strange sexual relationship with Ernest which culminated in the sex crimes of September 7, 1981, shows that appellant might repeat her crimes today is pure conjecture. Appellant was not examined by any of respondent's expert witnesses nor did they express any opinion on the question of her ability to care for her children. Nor did respondent call any witnesses from Frontera who had dealt with appellant during her incarceration to rebut appellant's evidence of her rehabilitation.

We fully appreciate the professional opinions of respondent's witnesses to the effect that the children's emotional and mental condition required their continued placement with the foster parents. This evidence, however, does not support a severance order since the children could have remained with their foster parents as guardians of the persons of the children. Moreover, Dr. Schorr's opinion that the children should be removed from appellant's custody and control "as soon as possible" was obviously based on his view of the children's best interests and not on appellant's unfitness as a mother. Dr. Schorr had never examined appellant nor had he examined any records pertaining to her incarceration. Dr. Schorr did not purport to express an opinion on the question of appellant's current fitness as a mother.

We draw two conclusions from the authorities under section 232, subdivision (a)(4): first, the welfare of the child is not the sole determining factor; the statute requires clear and convincing proof of the parent's unfitness to have the future custody and control of the child. This requires evidence such as expert opinion based on a personal examination of the parent, an evaluation of the parent's criminal history or conduct while in prison or other facts from which a rational inference may be drawn that the parent will be unable to properly care for the child in the future.

Second, prison incarceration does not ipso facto show a parent's unfitness under the statute. (See Welf. & Inst. Code, § 361, subd. (f).) The petitioner must prove by clear and convincing evidence that the parent has not or cannot be rehabilitated during incarceration so that when he or she is released from prison the parent would be unable to properly care for the child. Again, this requires solid, credible evidence and not mere speculation.

We conclude by commending the foster parents for their devotion to the children over the past four years. They have apparently established a loving and hopefully enduring relationship with each child. Our reversal of the judgment severing appellant's parental rights does not mean that the children should be taken from the custody of the foster parents upon appellant's release from prison. To the contrary, we contemplate that the foster parents

will be appointed guardians of the children with the hope that, as the children mature, a reunification plan eventually will be consummated so that the children will have a continuing relationship both with their foster parents and their natural mother. If such a plan is not consummated within a reasonable time, then another severance petition can be filed. In the final analysis, the ultimate wishes of each child will prevail on the question of their relationship with their mother.

The judgment is reversed.

Brown (G. A.), P. J., and Hamlin, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 24, 1986.