[No. G021264. Fourth Dist., Div. Three. Nov. 10, 1998.]

Guardianship of SYDNEY SIMPSON et al., Minors.
ORENTHAL J. SIMPSON, Petitioner and Respondent, v.
LOUIS BROWN et al., Objectors and Appellants.

916

918

**COUNSEL**

Kimberly A. Knill and Natasha Roit for Objectors and Appellants.

Stephen Temko and Paul Mones as Amici Curiae on behalf of Objectors and Appellants.

Meserve, Mumper & Hughes and Bernard A. Leckie for Petitioner and Respondent.

Marjorie G. Fuller for Minors.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

A guardianship was established for Sydney and Justin Simpson after their father, O. J. Simpson, was jailed on the charge of murdering Nicole Brown Simpson, their mother, and another victim, Ronald Goldman.[1] We need not go into the details of the killings, but certain basic, well-reported—and undisputed—facts about them are unavoidably relevant to the proceeding before us now: Nicole's throat had been slit, and she had been left in a pool of blood at her own doorstep while her children, Sydney and Justin, lay sleeping in the house. It was only a happenstance that the neighbors discovered the body first, sparing the children the horror of finding their dead

---

[1]Given the worldwide publicity surrounding this and the related cases involving the murder of Nicole Simpson and Ronald Goldman, no purpose would be served by trying to disguise the names of the parties involved.

mother. Whoever committed this crime must have acted in extreme rage and anger and been oblivious to the possibility that the victim's children might discover her body.

After his acquittal in a criminal trial, Simpson requested termination of the guardianship. At the hearing on the termination, the guardians sought to introduce evidence regarding the circumstances of Nicole Simpson's murder. The trial court refused to consider any of it, holding that the guardians had waived the issue by not listing any "murder witnesses" on their witness list.

At the time of this guardianship proceeding, the father also faced a *civil* trial in which the plaintiffs sought to establish his liability for the death of the mother. The guardians' attorneys apparently hoped the civil case would conclude in time for the court to take note of its results, which would not only spare their clients great expense, but also save the court the necessity of a prolonged examination of the murder evidence. The court, however, did not wait for the conclusion of the civil case (which, as is common knowledge, ended with a judgment of the father's liability), explaining in its written order that the civil case could not have thrown any light on the guardianship termination anyway, because, in its opinion, the civil case entailed a lower standard of proof than the one involved in the guardianship proceeding.[2] In any event, that case is itself not yet final for issue preclusion purposes, so the trial court could not take judicial notice of its *result*.

While we understand the incredible pressure the court was under, the fact remains that it made a number of errors. These errors require reversal of the order terminating the guardianship.

First and foremost, the grisly circumstances of the murder itself simply could not be ignored, even if consideration of them would have taken some time.[3] We acknowledge, of course, that consideration of the "murder issue" (as it is sometimes, rather understatedly, referred to in the briefs) would have necessitated a longer trial. However, because the court sat as a court of *equity*, dealing with the *interests of children*, not a court of criminal law in which the standard is guilt beyond a reasonable doubt, there was no need for reenactment of the so-called trial of the century. Consideration of the murder issue would have been conducted by a judge in a well-secured courthouse with the actual proceedings barred to the public, with the power to control

---

[2] As we discuss more fully below, the court erred in this regard.

[3] That information is now so well known that it is even part of the formal legal literature which the criminal trial has generated. (E.g., Bogard & Hall, *The Case Against O.J.: Was it an Illegal Search?* (Fall 1994) 28 Ark. L. Rev. 32, 32-33; Easton, *Lessons Learned the Hard Way From O.J. and "The Dream Team"* (1997) 32 Tulsa L. J. 707, 708, fn 8.) Simpson's criminal trial has also been the subject of at least 14 books.

the presentation of evidence and prevent unnecessary distraction and delay. With the cooperation of the parties at least, much of the evidence could easily have been presented by way of excerpts from the transcripts in the criminal and civil cases. Had the court considered the murder issue, there would have been no jury, no endless sidebar conferences, and no media distractions. Judges cannot avoid the single most important and relevant issue in a case—particularly a case involving children and the possibility of violence—just because trying that issue will take time. The standard is whether the consumption of time is "undue." (Evid. Code, § 352.)

Second, the court applied the wrong statute. It looked to section 3041 of the Family Code for its legal standards, which deals with an *involuntary initial* loss of custody against parental wishes (for example, when one set of grandparents seeks custody during a very nasty divorce) rather than section 1601 of the Probate Code, which directly deals with the standards a court should employ when *terminating* a voluntary guardianship, as was the case here.

Third, the trial court erroneously put the burden on the guardians to prove by clear and convincing evidence it was detrimental to the children to be returned to their father. Instead, as California courts have done for generations, the court should have examined the totality of evidence bearing on the father's fitness with the burden upon him to show sufficient overall fitness to justify the termination of the guardianship. (See *Guardianship of Kassandra H.* (1998) 64 Cal.App.4th 1228, 1233 [75 Cal.Rptr.2d 668] [noting that California courts have "for generations" examined overall moral fitness of parents seeking to terminate voluntarily established guardianships].)[4]

Fourth, the court erred in excluding evidence found in the mother's diaries bearing on the father's possibly violent tendencies. The great irony here is that the Legislature had amended the statute involving the hearsay rule (see Evid. Code, § 1370) specifically to assure that *this particular mother's diaries* could be admitted into evidence. The court's error caused it to minimize the potential for domestic violence from the father, even apart from the problem of the violent murder of the mother.

Finally, as to the ultimate disposition of the case by the trial court, we must note the glaring and conspicuous absence of any intervention by the relevant social service agencies charged with protecting children when there is the threat of domestic violence. As we explain below, social workers regularly intervene in cases where there are allegations of domestic violence far less serious than those here. Accordingly, on remand (assuming that the

---

[4]While the *Kassandra H.* decision pulled together many decisions over the years pointing to that conclusion and clarified some previously murky areas of guardianship law, to be fair we must point out that the trial court did not have the benefit of the decision at the time.

court, after hearing *all* the relevant evidence, decides that the guardianship should still be terminated), we direct the trial court to consider whether to refer the case to the relevant social service agency for a possible dependency petition if the evidence concerning Simpson's alleged propensity for domestic violence warrants it.

## II. THE HISTORY OF THE GUARDIANSHIP

Sydney and Justin's mother, Nicole, and Ronald Goldman were murdered on June 12, 1994. Five days later Simpson was arrested for the crime. On the day of his arrest Simpson signed a document giving temporary care of Sydney and Justin to their maternal grandparents, Louis and Juditha Brown; later, on July 27, 1994, the Browns petitioned the trial court to be appointed guardians of Sydney and Justin. Several months later, on October 7, 1994, the court made a formal order appointing the Browns as the children's guardians.[5]

Simpson's incarceration lasted some 17 months. When released he promptly filed a petition to terminate the guardianship pursuant to section 1601 of the Probate Code, asserting that in light of his release there was "no further need" for the guardianship.

The case was originally assigned to Commissioner Thomas H. Schulte, who commenced hearing the case in late September 1996. One of the first orders of business was the question of who had what burden of proof. After receiving points and authorities and hearing argument on the issue, Commissioner Schulte sided with Simpson in ruling that the burden was to be on the guardians to show by clear and convincing evidence that it would be detrimental to return the children to their natural parent.

Just a few days later, on October 4, then Presiding Judge of the Orange County Superior Court, Judge Ted Millard, reassigned the case for all purposes to Judge Nancy Wieben Stock. Judge Millard's written minute order gives no reason for the abrupt change.

---

[5]The order followed in the wake of a stipulation to that effect between Simpson and the Browns, subject to the proviso that "Simpson was entitled to seek termination of [the] guardianship and a resumption of his status as a parent having legal and physical custody upon his release from incarceration."

The original stipulation, filed on August 31, had also recited that Simpson nominated the Browns to serve as guardians "until such time as [he] is able to resume his legal and physical custody of said minor children." That language subtly implies that Simpson was *entitled* to end the guardianship based on the contract between him and the Browns upon his release from incarceration. In defending the termination of the guardianship in this appeal, though, Simpson has not made any entitlement argument based on the language of the stipulation, nor could he. Children, as this court pointed out in *Guardianship of Kassandra H., supra,* 64 Cal.App.4th at page 1239, are not chattels who can be "temporarily deposited in the hands of some bailee to be recovered at will—like an old lamp that one doesn't know what to do with, so one puts it in storage."

Within a few weeks, on October 24, 1996, Judge Stock sent a letter to an expert psychologist already in the case, Jeffrey M. Ludlow, indicating that she had adopted Commissioner Schulte's view of the burden of proof question. In doing so, she cited *Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418 [47 Cal.Rptr.2d 409]. (As we later explain at length, *Stephen G.* is *not* applicable to this case.) She told Dr. Ludlow that "[t]he standard of proof required of the guardians at trial is 'clear and convincing' evidence."

On November 8, as the hearing before the new judge drew nigh, Simpson presented a preliminary written request to the trial court to exclude any evidence "concerning the details of the murder of Nicole" and "any evidence concerning the person responsible for the murders." The argument consisted of exactly two sentences, the gravamen of which was that the mere fact that Simpson had been acquitted in the criminal trial obviated any need to consider the issue. We reproduce those two sentences in the margin.[6]

Also on November 8, the Browns presented a witness list of some 17 nonexpert witnesses, 37 witnesses whose deposition testimony they wished the court to consider, and 5 expert witnesses. Heading the list of nonexpert witnesses was Simpson himself, whose "expected area of testimony" was cryptically described as an "E.C. [Evidence Code] § 776 examination," i.e., he was going to be called as a "hostile witness."

Hearings, closed to the public, commenced November 12, 1996. The trial court did not rule on Simpson's motion until December 4. This was some 2,100 pages of transcript into the trial. Then, in the context of the recross-examination of an expert witness favorable to Simpson on the domestic violence issue, the attorney for the guardians asked him, "Did you take into consideration in any of the opinions that you rendered either on direct examination or on cross any evidence of the murders? And I should be more specific. Any evidence of whether or not Mr. Simpson committed the murders?"

The question elicited an immediate objection from Simpson's counsel, and a subsequent colloquy with the trial judge concerning inquiry into the

---

[6]Here is the *entirety* of Simpson's written argument in support of the proposition that the trial court should exclude any evidence of the person responsible for the murder of the mother. The reader will note that not a single statute, case or general principle of law is mentioned: "Testimony concerning who committed the murders of Nicole Simpson and Ron Goldman is irrelevant and immaterial to the issues pending before the court on the issue of custody. [¶] The Petitioner, who is the natural father of the minor children, has been acquitted of murder by a unanimous jury verdict and there is no basis to retry the criminal case."

We explain below why it does not follow from an acquittal by a "unanimous jury verdict" (*sic*: all jury verdicts in criminal trials must be unanimous) that the issue of who killed the mother of two minor children is irrelevant.

murder issue. The essence of the judge's comments centered on delay: Trying the murder issue would have meant delay and delay would not have been in the best interests of the children. After having made her "record" for this appeal, counsel for the guardians stopped arguing the point.

On December 20, 1996, the trial judge filed a written decision granting Simpson's petition to terminate the guardianship. The court gave a history of the proceedings, noted that it had heard evidence of the relationship between Simpson and his children, then turned to the legal standard. It reiterated its conclusion that the case was governed by Family Code section 3041, and thus the guardians had the burden of proving detriment by "clear and convincing" evidence. The court then found the "children share a relationship with their father that appears to be strong, positive, and healthy, with powerful psychological bonding." It also found that "psychological testing, clinical observations and review of Simpson's history with the children does not yield a picture of a man who has in the past, or is likely in the future, to lose control of himself in such a manner as to emotionally or physically harm his two young children." The trial judge further decided that evidence of puffiness on Nicole's face or "bruises on occasions" could not be tied "to any domestic violence."

The judge confronted the murder issue in a separate section of her written findings and order under the heading of the "Civil 'Wrongful Death' Verdict." (At this time there had been no verdict in the separate action—that came only a few days *after* the judge made her decision.) "It is suggested that the subject matter of the case involves issues of Simpson's conduct that may be pertinent to the minors' interests therein. The court did not receive any evidence in the custody trial concerning allegations of murder by Simpson. That being the case, it would be improper to speculate as to the effect that such evidence would have had on the ultimate result in the custody case."

Then, after writing that the outcome of the civil trial would not be binding in the guardianship case because the standard of proof in the civil trial was *lower* than the one in the guardianship trial, the court addressed the question of whether it should have allowed "the homicide case to be put on in the custody trial." The answer was no, because "the request came weeks after the respondents [the guardians] had submitted a witness list of 42 individuals and an exhibit book, none of which contained any of the homicide witnesses or evidence."[7] The judge then characterized "the request [to allow evidence of the murder of Nicole]" as having come "after all counsel had completed trial preparation, submitted witness lists and after all of the appointed and

---

[7]Simpson himself was on the witness list as a hostile witness. While we need not deal with whether Simpson might have successfully invoked the Fifth Amendment (because of, say, a

retained experts had completed their evaluations and submitted their results." Accordingly, said the court, the request "was denied by the Court as untimely." It added that after "11 months of pretrial delay and in consideration of the considerable risk to the children of further damaging publicity that would accompany an unprecedented third 'homicide trial' of Mr. Simpson, . . . terminating the custody case and continuing it indefinitely so that this matter could be re-tooled into a homicide trial, would not be in the best interests of the children."

At the end of January 1997, the trial court denied the Browns' request to stay the order terminating the guardianship pending this appeal. In doing so, the judge wrote, "[I]n reviewing the trial record herein, the Court cannot conclude that there is a likelihood of reversal on appeal . . . ." The court reasoned that because the matter had been given "a full hearing" and because "[a]t each stage in the proceedings, the [guardians] were granted what they requested." There was thus, the court concluded, "no denial of any opportunities for persuasion that would require reversal in this case."

The Browns appealed from the judgment terminating the guardianship in 1997, but did *not* request a writ that would have overruled the trial judge's decision not to stay her ruling pending appeal. The failure to request a writ resulted in Simpson having custody during the pendency of this appeal. Not until March 1998 did they request preference on our calendar. We immediately granted that request.

### III. DISCUSSION

#### A. *The Evidence Bearing on "the Murder Issue"*

##### 1. *The Relevance of the Evidence*

■ Let us get right to the point. The murder of Sydney and Justin's mother was an extraordinarily violent act showing callous disregard for them. *If* Simpson committed the crime, that information was highly relevant to whether the children should be returned to him. As Commissioner Schulte observed, it would fly in the "face of reason" to conclude otherwise.

It may reasonably be inferred from the almost universally known circumstances of the killing that the crime evidenced great violence and rage. We by no means must conclude that Simpson committed the crime to say that *if* he did, that fact was certainly relevant to show a *propensity toward violence* on his part.

As a matter of case law, as well as common sense, the question of whether one parent has actually murdered the other is about as relevant as it is

---

future federal criminal prosecution), the point is that the *Browns* signaled an intention to call him.

possible to imagine in any case involving whether the surviving parent should be allowed any form of child custody. *In re Sarah H.* (1980) 106 Cal.App.3d 326 [165 Cal.Rptr. 61] is particularly instructive in this regard. There, the father was a "hard-drinking ranch hand" who "had been a good father to all his children." (*Id.* at pp. 331-332 (conc. opn. of Reynoso, J.).) However, he had a tendency to become violent when drunk; indeed, as the court put it, "alcohol-induced violence was consistent with the father's character." (*Id.* at p. 330.) He beat the mother to death in one of his drunken rages (he was later found guilty of voluntary manslaughter after a no contest plea), and his tendency to such violence was held to constitute substantial evidence justifying not only the establishment of a guardianship—much less its continuation—but also the actual *termination* of *all* parental rights in a dependency proceeding because detriment beyond a reasonable doubt had been shown. (*Id.* at pp. 328-329.)

In *Guardianship of Kassandra H., supra,* 64 Cal.App.4th 1228, 1237-1238, this court concluded that the standards of juvenile dependency law necessarily entailed standards more solicitous of the rights of natural parents than guardianship law, because in dependency it is the government which *involuntarily* removes children from their natural parents. Under such circumstances the fundamental nature of parents' rights to the care, custody and management of their children (often rather inelegantly referred to by lawyers as a "liberty interest"[8]) dictates a high standard of evidence to justify removal. (See also *Guardianship of Stephen G., supra,* 40 Cal.App.4th at pp. 1425-1427.) If evidence of a tendency to violence induced by drink was sufficient to justify a full-scale termination of parental rights in the dependency context in *In re Sarah H., supra,* 106 Cal.App.3d 326, how much more so should the question of a tendency to violence shown by two killings justify simply keeping a guardianship in place here.

It is true that the *Sarah H.* court noted (perhaps just a little too drolly) "uxoricide is not per se a basis for termination of parental rights." (*In re Sarah H., supra,* 106 Cal.App.3d at p. 329.) For this proposition it cited the earlier case of *In re James M.* (1976) 65 Cal.App.3d 254, 265-266 [135 Cal.Rptr. 222].

The doctrine of stare decisis does not force us to follow the decision in *In re James M.*, coming as it did from a court of equal level to our own. And there is much in *James M.* that warrants skepticism, since it must be acknowledged that the bottom line of the decision is this rather counterintuitive rule: The fact a father kills his children's mother, standing by *itself,*

---

[8]The awkwardness of the phrase derives from the need for courts to fit the relationship into one of the three Lockean categories listed in the 14th Amendment to the federal Constitution, "life, liberty or property."

does not *automatically* compel a finding that it would be *detrimental* to allow the father to have custody. (See 65 Cal.App.3d at pp. 265-266.) It is a proposition which we do not necessarily endorse in this opinion. However, for the moment, it is enough to note that a careful reading of *James M.* shows that it, too, demonstrated the obvious relevance of the murder issue to the guardianship termination proceeding then before the court.

In *In re James M.*, the mother ran off to Canada with her lover and the couple's four children, after playing on the father's love for her and leading him to believe they were reconciling. The father was devoted to his children—he begged the mother to let him visit them—and matters were aggravated when the father learned that the lover was mistreating the children. (See 65 Cal.App.3d at p. 258.) "Still gullible" as to the mother's intentions, as the court put it, the father employed a ruse to get the mother to go with him in his car.

Here is the court's description of the key events: "He pleaded with her to return to him with the children. She refused. They argued. Still in the car, [the father] threatened her with the knife. He said [and *he* was believed by the trial court] she directed the knife to her breast. She may have dared him to use it. One of the psychiatrists opined it was the expression of a death wish on her part, for whatever that opinion may be worth. [The father] stabbed her over and over." (65 Cal.App.3d at p. 259.)

But—very importantly—there was more in *In re James M.* than *just* an act of passion by a man who killed a mother who had run away because he was obsessed with his children as well as her. The father underwent psychiatric treatment. There was evidence that the killing was "totally out of character." (65 Cal.App.3d at p. 259.) Even more importantly, the probation officers noted *the father's remorse and sense of guilt.* He was found to be "not violent or delinquently oriented"; he was "genuinely concerned for his children" and "his prognosis for success on probation" was good. (*Ibid.*) In light of *that* evidence, the trial court dismissed the juvenile dependency petition,[9] and the Court of Appeal upheld the decision as against an appeal by the local department of public welfare. The appellate court concluded that the trial court might have "reasonably" found that the crime "was a crime of passion, not the product of a violent and vicious character, but comprehensible within the framework of human folly, weakness and imperfection." (*Id.* at p. 266.)

It is one thing, as the trial court did in *In re James M., supra,* 65 Cal.App.3d 254, to receive evidence concerning the killing of one parent by the other, the precise events leading up to that killing and, most importantly, *the guilty parent's remorse and psychological condition in light of his remorse*

---

[9]The case took place prior to the revisions in the dependency system in the late 1980's, so the petition was filed under former section 232 of the Civil Code.

*and the fact of the killing,* and then conclude that, given all the facts and circumstances, it would not be detrimental to allow the father to retain his parental relationship with the children. That line of reasoning is thoroughly consistent with what this court emphasized in *Guardianship of Kassandra H., supra,* 64 Cal.App.4th at page 1236—namely, a court must examine the "totality of evidence" bearing on the fitness of the parent seeking termination of the guardianship.[10] It is quite another thing, as the trial court did here, to exclude evidence concerning the possible killing of one parent by another and the ramifications of that possibility.

Finally, the analogous case of *Guardianship of Smith* (1957) 147 Cal.App.2d 686 [306 P.2d 86] is also instructive. There, the mother was tried and, like Simpson, acquitted of the murder of the other parent arising out of his death in a car bomb planted by the mother's paramour. Despite the acquittal, the trial judge allowed the entire record of a murder trial to be admitted into evidence, and the evidence contained in that record formed the basis of a decision to maintain the guardianship, which was then upheld on appeal. (See *id.* at p. 699.)

It is clear, then, that evidence of whether Simpson killed Sydney and Justin's mother was not only relevant to the termination of the guardianship, it was so relevant that it could not reasonably be ignored.

### 2. *The Possible Waiver of the Murder Issue*

The trial judge stated that she did not consider evidence of the murder issue because the guardians' counsel had, in effect, waived it. There is, however, no such waiver in the record. In point of fact the question of whether Simpson killed Sydney and Justin's mother, Nicole, was raised a number of times prior to the judge's definitive ruling to exclude any evidence on the point.

On August 20, in discussing the anticipated motion by Simpson to exclude any evidence of the killing, Commissioner Schulte stated from the bench: "The court's feeling is as follows: We are not inviting a retrial of the murder case and the court sincerely hopes that we are not going to be involved in that in a significant way; however, it is impossible for the court to say to

[10]Reliance by the minors' counsel on *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918] for a simplistic detriment standard is misplaced. In *Baby Girl M.* the court said that Civil Code former section 4600 (now section 3041 of the Family Code), with which we deal below, applied to a parental rights adoption hearing under former section 7017 of the Civil Code (now 7664 of the Family Code). As the Supreme Court later pointed out in *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 840 [4 Cal.Rptr.2d 615, 823 P.2d 1216], *Baby Girl M.* was repudiated by the Legislature: "The linchpin of our decision in *Baby Girl M.* was statutory rather than constitutional. . . . We need not belabor the *Baby Girl M.* court's statutory analysis. Two years after our decision, the Legislature amended section 7017, abrogating our decision by stating, 'Section 4600 does not apply to this proceeding.' "

itself that it is irrelevant whether one parent killed another in a guardianship case. It flies in the face of reason."

On September 25, 1996, then counsel for the Browns pointed out a number of items involving Simpson's fitness to parent at the time the guardianship was first established, including that he had "murdered the children's mother." On November 12, 1996, the first day of trial, the court heard Simpson's motion to preclude the guardians from introducing any evidence "concerning details" of the murder of the mother. The court took that matter under submission and then began the trial.

On November 13, after finishing her examination of Simpson on matters unrelated to the killing, the guardians' attorney told the court: "I have previously indicated to the court it is my intention to reserve the right to ask Mr. Simpson questions about the murders of June 12, '94, and that [it is my hope] that we could reserve the questioning on the murders subject to the court's determination that we concluded the detriment portion of this case . . . ." There was then some colloquy between the guardians' counsel and the court, the gravamen of which was that counsel for the guardians could prepare a witness list on the murder issue that "would be essentially the same witness list as on the civil action," but would rather have the court wait until after the conclusion of the civil proceeding or "take judicial notice of the testimony in the criminal proceeding." The judge, however, made it clear that she did not think she could take "judicial notice of the completed transcribed testimony in the criminal case" or any notice of the then "ongoing" civil case.

On November 20, 1996, counsel for the guardians mentioned the murder issue again. She acknowledged that the court did not want to take up the issue at that point in the trial, but did not "want the record to reflect that . . . I waived my right" on the issue. The court replied by saying, "I understand your desire to preserve that issue."

On December 3 counsel for the guardians told the judge: "I cannot simply rest my case without indicating to the court that we are prepared to proceed with the murder part of the case," though she acknowledged scheduling was problematic. "I appreciate the scheduling part of it," she said. "I appreciate the fact that it would be extremely time-consuming, but to rest this case and say that we can ignore the murder part of it, I just can't do that on behalf of my clients." The trial judge characterized counsel's remarks as a motion "to reopen their [the guardians'] witness list."

Appointed counsel for the minors then took the position that the matter should not be delved into, because, given the outcome of the criminal case, "even if he is found to be liable in the civil trial, he will still not have been

found to be a murderer." After hearing minors' counsel's arguments, the court "reserve[d] on that particular issue."

On December 4 the trial judge finally ruled on the question of whether the "murder issue" should be tried. Her answer was no. Toward the end of the discussion the minors' counsel stated she felt she had "argued this point sufficiently on the record and the court has rendered its decision." Hence we conclude that, whatever else may be the case, the most important issue in the case certainly was not waived.

### 3. The Respective Burdens of Proof as They Relate to the Guardianship Termination Proceeding

■ In her written findings and order, the trial judge confronted the issue of whether she should wait for the results in the civil trial based on the alleged killing of Nicole by Simpson. Essentially, she reasoned that it would do no good, because the civil trial involved a lower standard of proof (preponderance of the evidence) than the standard which she thought applicable in the guardianship termination proceeding before her (clear and convincing evidence). And, though the standard of proof in the criminal trial was something even higher than that (beyond a reasonable doubt) the fact of Simpson's acquittal appears to have led the judge to believe that the criminal murder trial was irrelevant.

As we have already indicated, the case got off on the wrong foot when Commissioner Schulte ruled that the standard of proof would be for the guardians to show by clear and convincing evidence that it was detrimental to return the children to Simpson. Indeed, in this appeal Simpson and the minors' counsel assert the same position.

The cases relied on for the purported higher standard of proof fastened on the guardians here, *In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244] and *Guardianship of Stephen G., supra,* 40 Cal.App.4th 1418, simply do not stand for such a standard in a guardianship *termination* proceeding. Neither case involved the termination of a guardianship under section 1601 of the Probate Code (the section which Simpson himself cited in his initial petition) and neither case involved a guardianship which was initially established voluntarily.

*In re B. G.* was a case which arose out of, quite literally, the Cold War in the aftermath of the Soviet invasion of Czechoslovakia in 1968. The father escaped with his two children, eventually reaching relatives in the United States; he soon died. Meanwhile, the children were put into foster care as part of the juvenile dependency system. The mother, from behind the Iron Curtain, sought custody and the case made the "evening news" when the children were flown to Czechoslovakia (see *In re B. G., supra,* 11 Cal.3d at

pp. 685-686); the legal battle involved whether the mother would be able to get the children back. The trial court made, essentially, a "best interests" determination, which would allow the children to stay in the United States with their foster parents. Our Supreme Court reversed. The high court did not, however, analyze the case under section 1601 of the Probate Code which directly deals with guardianship termination proceedings, but under the family law statute (former section 4600 of the Civil Code, now section 3041 of the Family Code) dealing with initial awards of custody in family law cases. Applying the "parental preference doctrine," the court held that the trial court erred. The case against the mother was based on such psychological nebulae as a lack of warmth, an inability to express her love for her children, and a second marriage to a younger man. (See *In re B. G.*, *supra*, 11 Cal.3d at pp. 686-687, fn. 10 [quoting comments of trial judge].) Against any real detriment to the children, the fact the mother *was* the mother was dispositive in a context where there was an attempt to establish a guardianship for the first time and against the parent's will.

Like *In re B. G.*, *Guardianship of Stephen G.*, *supra*, 40 Cal.App.4th 1418 did *not* confront the operation of the statute in the case before us, section 1601 of the Probate Code. Again, the case did not involve the termination of a voluntarily established guardianship, but the involuntary *creation* of a guardianship. (See *Guardianship of Stephen G.*, *supra*, 40 Cal.App.4th at pp. 1421-1422.) Accordingly, the court looked to the family law initial custody award statute, section 3041 of the Family Code, in determining the applicable standard of proof. (See 40 Cal.App.4th at pp. 1423-1424.) Because a guardianship was being, in essence, forced upon the child of an objecting natural parent, the appellate court noted that due process required the same clear and convincing standard of proof applicable to the termination of parental rights in juvenile dependency cases.[11] (See 40 Cal.App.4th at p. 1425; see also *Santosky* v. *Kramer* (1982) 455 U.S. 745, 747-748 [102 S.Ct. 1388, 1391-1392, 71 L.Ed.2d 599] and *In re Angelia P.* (1981) 28 Cal.3d 908, 917-919 [171 Cal.Rptr. 637, 623 P.2d 198].)[12]

As explained in *Kassandra H.*, the paradigm characteristic of the juvenile dependency law—the need to justify deprivation of custody by clear and

---

[11]The closest *Stephen G.* came to addressing Probate Code section 1601 was in dicta, where the court observed that the statute "requires no consideration of the parents' liberty interest, protection of which is therefore dependent on the broad discretion of the trial court." (*Guardianship of Stephen G.*, *supra*, 40 Cal.App.4th at p. 1426.) We need not detain ourselves trying to explicate the court's observation. Unless a court were to adopt the extreme idea that a detriment-by-clear- and-convincing-evidence standard is required as a matter of *constitutional* law in any guardianship termination proceeding—and that manifestly is *not* the law in California as we showed in *Guardianship of Kassandra H.*, *supra*, 64 Cal.App.4th 1228—*Stephen G.*'s observation is irrelevant.

[12]However, it is too general a proposition to say that the termination of parental rights always and in all contexts requires clear and convincing evidence even in juvenile dependency cases. The subject is explored and explained in *Cynthia D.* v. *Superior Court* (1993) 5

convincing evidence of detriment—is not the proper model for guardianship termination law. (See *Guardianship of Kassandra H., supra*, 64 Cal.App.4th 1228, 1237.) It is one thing for the government to wrest a child from a parent and place him or her with foster parents against the wishes of that parent, then move to terminate parental rights absolutely. It is another for a parent—faced with some personal difficulty which makes it difficult or impossible to rear his or her children—to voluntarily establish a relationship which, unlike juvenile dependency law, need *not* move toward the ultimate and absolute termination of all parental rights. It is the latter situation which obtains here, and therefore the concerns which require a clear and convincing standard of detriment in the juvenile dependency context do not apply.[13]

As also shown in *Kassandra H.*, California courts have for many years looked to the overall fitness of the parent in construing the guardianship termination statute. (*Guardianship of Kassandra H., supra*, 64 Cal.App.4th at pp. 1239-1240; see, e.g., *Guardianship of Boulad* (1949) 90 Cal.App.2d 135 [202 P.2d 562]; *Guardianship of Brock* (1957) 154 Cal.App.2d 431 [316 P.2d 3]; *Guardianship of Davis* (1967) 253 Cal.App.2d 754 [61 Cal.Rptr. 297]; accord, *Guardianship of Case* (1943) 57 Cal.App.2d 844 [135 P.2d 681];

---

Cal.4th 242, 250-256 [19 Cal.Rptr.2d 698, 851 P.2d 1307] (California's juvenile dependency scheme is constitutional despite fact that certain determinations are made by only a preponderance of evidence, not clear and convincing evidence).

[13]A weak spot in the analysis of the *Stephen G.* court is the way it jumped from textbook juvenile dependency law concerning the need for a clear and convincing standard for the *termination* of parental rights to the *initial* establishment of a guardianship. (See *Guardianship of Stephen G., supra*, 40 Cal.App.4th at pp. 1425-1427.) The court made the jump by stating that "[a]s a practical matter, then, many guardianship orders will forever deprive the parent of a parental role with respect to the affected child." (*Id.* at p. 1427.) Then the court caught itself: "Even if this were not so, courts have required proof by clear and convincing evidence where the invasion of parental rights was not more 'irrevocable' than in guardianships." (*Ibid.*) At that point the court cited a number of juvenile dependency cases, and ended with, "Under the procedure then in effect, such orders effected a severance of parental rights no more 'irrevocable' than the one resulting from an order of guardianship." (*Ibid.*)

With due respect to the *Stephen G.* court, the facile equation of dependency law with the establishment of guardianships is dubious. Anyone familiar with dependency law will know that entirely different "dynamics" apply to the two bodies of law. (See *Guardianship of Kassandra H., supra*, 64 Cal.App.4th at p. 1237.) In dependency law, the great arsenal of governmental power is brought to bear against a parental relationship, with the child frequently, in effect, placed on a conveyor belt leading to the absolute termination of all parental rights and contact. Under such circumstances *of course* some pretty high safeguards are needed, to wit, the clear and convincing standard. The same does not apply to the kinder, gentler body of law involving guardianships—certainly voluntarily established ones at the very least—where there is no prospect of absolute termination of all parental rights. The *Stephen G.* court's reference to "forever deprive the parent of a parental role" is simply too hyperbolic. Such a dire prospect need not happen; indeed it need not happen in the case before us even if, on remand, the guardianship is reestablished. Accordingly, we have our doubts about the soundness of *Stephen G.* even if it applies to the *initial creation* of guardianships. However, we need not formally part company with it because it is readily distinguishable.

*Guardianship of M.S.W.* (1982) 136 Cal.App.3d 708 [186 Cal.Rptr. 430].) To distill more than 50 years of case law explicating Probate Code section 1601 (and its predecessor statute): The burden in a guardianship termination proceeding is *not*—as the trial judge assumed here—upon the guardians to show by clear and convincing evidence there would be detriment to the child to be returned to the natural parent. Rather it is upon the parent to show "overall fitness" on his or her part "sufficient to overcome the inherent trauma of removing a successful caregiver." (*Guardianship of Kassandra H., supra,* 64 Cal.App.4th at pp. 1239-1240.)[14]

Here, because the trial judge applied the wrong burden of proof in this guardianship termination case, she imputed too much significance to Simpson's acquittal in the criminal trial.

### 4. *The Effect of the Criminal Trial on the Guardianship Termination Proceeding*

██ Another thought which emerges from the trial judge's written order as to why she did not consider the murder issue involves the legal doctrines known as collateral estoppel and res judicata. These two doctrines deal, to be somewhat simplistic, with what happens *later* when a court does something *earlier.*

The standard of proof in a criminal proceeding is, of course, evidence of guilt beyond a reasonable doubt. The standard of proof in a civil liability trial is lower—evidence of liability by a preponderance of the evidence. It is this same preponderance standard which is applicable to guardianship termination proceedings. As one might surmise from the respective differences in the standards, an issue might be litigated in one case, but that would *not* stop it from being litigated in another if the standard of proof in the first case were *higher than the second case.* (E.g., *In re Alexis M.* (1997) 54 Cal.App.4th 848, 851 [54 Cal.App.4th 848, 63 Cal.Rptr.2d 356] [parent in juvenile dependency proceeding not collaterally estopped from litigating question of causation of child's death already litigated in criminal proceeding]; *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 563 [64 Cal.Rptr.2d 93] [doctrine of collateral estoppel may not apply where two proceedings have differing burdens of proof]; *In re Nathaniel P.* (1989) 211 Cal.App.3d 660, 670 [259 Cal.Rptr. 555] ["differing standards of proof" barred "application of collateral estoppel"].) Obviously, then, the fact that a jury in Simpson's

---

[14]It is, we might add, an easy yoke to carry most of the time. Guardianship termination cases typically revolve "around a drama of parental trouble and reformation." (*Guardianship of Kassandra H., supra,* 64 Cal.App.4th at p. 1233.) When the parent is out of trouble, out of the military, or out of a hospital, he or she will *usually* be sufficiently fit to resume parental responsibilities. Even so, the court must still evaluate the overall moral fitness of the natural parent. (*Ibid.*)

criminal trial returned not guilty verdicts could not be dispositive of whether Simpson actually did the killings. (If the jury had returned guilty verdicts, however, it would be dispositive; see *People* v. *Sims* (1982) 32 Cal.3d 468, 485 [186 Cal.Rptr. 77, 651 P.2d 321]; *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 606 [25 Cal.Rptr. 559, 375 P.2d 439].)[15]

It was manifestly unfair to the guardians to preclude them from introducing any evidence concerning the murder, which, aside from bearing on Simpson's overall moral fitness, would include such highly relevant matters *from the children's point of view* as how they had been affected by the attendant publicity, who might better serve to protect them from adverse media attention, and how best to cope in light of the worldwide media attention which their case had already received. The court could not blind itself to such issues, yet the guardianship termination proceeding was the only forum where such matters would command the proper focus of judicial attention. A court dealing with the welfare of minor children cannot "shut its eyes" to any threat to them just because that threat may have been the subject of some proceeding in a different forum. (See *In re Benjamin D., supra,* 227 Cal.App.3d at p. 1470.)

## 5. *Resolution of Any Doubt on the Murder Issue*

One of the reasons given by the trial court for refusing to consider the single most important issue bearing on the father's fitness to parent his children was that the issue had been waived because no "murder witnesses" were on the guardians' witness list. Now it is perhaps true that the Browns' attorneys may be faulted for not doing more to place the murder issue squarely on the agenda of the court from the very beginning. However, any doubt about whether they raised the issue should have been resolved in the Browns' favor.

In the United States we have what is often called an "adversarial system" of justice. (E.g., *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 878 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845] [noting the importance of

---

[15]We must also point out at this juncture that while it might have been wise for the trial judge to wait until the decision in Simpson's civil trial, the results in *that* case are also not conclusive for purposes of this guardianship termination proceeding. *In re Benjamin D.* (1991) 227 Cal.App.3d 1464 [278 Cal.Rptr. 468] is analogous on this point. There, this court was faced with the question of whether a family law court's previous ruling in a hearing involving visitation rights, in which the issue of the father's alleged cruelty to the child was aired, would be binding on a juvenile dependency court. This court said no, because the "purposes and parties" of the two proceedings were not the same. (*Id.* at p. 1469.) While the family court was concerned about the rights of parents vis-á-vis each other, it was only the juvenile dependency court that could exclusively focus on the welfare of the child. (*Ibid.*)

Also, as mentioned earlier, the liability verdict in the civil case does not have collateral estoppel effect here because the civil case is not yet final. We express no opinion as to any of the issue preclusion questions that may very well arise in the future.

assistance of counsel in context in "Anglo-Saxon adversarial system of justice"].) However, because it is adversarial—as distinct from "inquisitorial"—it is sometimes easy to forget that the purpose of the system is *not* to hold a contest for its own sake. The purpose of our system of justice is still, in Justice Traynor's phrase, "the orderly ascertainment of the truth" (*Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 60 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213]) and the application of the law to that truth. Just because a court must rely on fallible litigants to present competent evidence does not vitiate the fundamental purpose of the proceeding, which is most assuredly not to have a *contest* but to establish what actually happened. The adversarial system works not because it is a contest to see who has the cleverest lawyer but because allowing two or more sides to present evidence to a neutral decisionmaker is an epistemologically sophisticated way *to get at the truth*.[16] And while certain aspects of the law, namely the fact that there are fixed rules and outcomes, allow it to be analogized to a game,[17] it is most definitely not a spectator sport.[18]

In *Adams* v. *Murakami* (1991) 54 Cal.3d 105 [284 Cal.Rptr. 318, 813 P.2d 1348], a case dealing with the proof and nature of punitive damages in ordinary civil cases, Justice Baxter observed on behalf of the court the " 'game' theory of litigation is particularly inappropriate when the *public* interest is at stake." (*Id.* at p. 120, original italics.) If the "game" model of litigation is not appropriate when it comes to punitive damages and economics (see *ibid.*), how much less appropriate is it when the welfare of *children and families* is at stake. (See generally, *Blanca P.* v. *Superior Court* (1996) 45 Cal.App.4th 1738, 1752-1754 [53 Cal.Rptr.2d 687] [emphasizing need to get at the *truth* of molestation allegations in dependency case].)

To quote again from *Adams*: " 'The trial of a law suit is not a game where the spoils of victory go to the clever and technical regardless of the merits, but a method devised by civilized society to settle peaceably and justly disputes between litigants.' " (54 Cal.3d at p. 120, quoting *Simon* v. *City & County of San Francisco* (1947) 79 Cal.App.2d 590, 600 [180 P.2d 393].) Amen.

---

[16]It is a principle of ancient origins. As one writer who himself had achieved some prominence as a family law judge once observed about the importance of adversarial justice: "He that is first in his own cause seemeth just; but his neighbor cometh and searcheth him." (*Proverbs* 18:17.)

[17]Cf. *Green* v. *Rancho Santa Margarita Mortgage Co.* (1994) 28 Cal.App.4th 686, 693-694, footnote 3 [33 Cal.Rptr.2d 706] (noting legal "gamesmanship" used in mathematical sense of strategy within closed systems).

[18]Indeed, as our Supreme Court noted in *Chronicle Pub. Co.* v. *Superior Court* (1960) 54 Cal.2d 548, 561 [7 Cal.Rptr. 109, 354 P.2d 637], one of the great reforms of 20th century jurisprudence—allowing open discovery so that each side could learn the facts and allegations of the other side before trial—was enacted with the principal purpose in mind of "doing away with the sporting theory of litigation."

As judges, we are charged with ascertaining the truth of the most important aspects of a case. In light of the importance of the murder evidence to the welfare of the children, any doubt as to whether the murder issue had been raised should have been resolved in favor of hearing it rather than excluding it. We are not charged with following legal logic to the point where it defies common sense.

### 6. *Time Considerations Regarding the Murder Issue on Remand*

■ Besides waiver, the trial court also gave the undue consumption of time as a reason to avoid considering the murder of the mother. Given the overwhelming relevance of the issue, it is impossible to avoid the conclusion that the consumption of *time* as a reason to avoid it is simply untenable. A trial judge's discretionary authority in the management of evidence does *not* extend to arbitrarily refusing to consider the most salient issue in the case. (See *O'Mary* v. *Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 575-576 [69 Cal.Rptr.2d 389] [abuse of discretion to exclude as more prejudicial than probative evidence which "is the very core of the case"].)

That said, trial of the question by a court sitting in equity without a jury and charged with getting to the truth of the matter need hardly entail a reenactment of Simpson's criminal trial or a media circus. The most obvious difference is that the proceeding will be private, in a well-secured courtroom, without a jury. More importantly, the trial court will have at its disposal a number of powers which the judge in the criminal trial did not have, which, if used proactively, should do a great deal to shorten the trial of the issue.

Primarily, local rule 450 of the Superior Court of Orange County Rules provides for "issue conferences" in all cases. One of the duties of the respective attorneys at an issue conference is to "[s]tipulate to all facts amenable to stipulation." The idea is to narrow the number of issues which must actually be tried to those on which there is a genuine dispute of fact. (E.g., U.S. Dist. Ct. Local Rules, Central Dist., rule 9.4.3 [West's Cal. Rules of Court (Fed. ed. 1998 rev.) p. 563] ["The parties shall make every effort to stipulate to facts upon which the parties know or have reason to know there can be no dispute for the purpose of simplifying the issues of fact to be tried."].) Civil courts, unlike criminal courts, have the power to cut through bogus disputes of fact; they have the power to keep the parties honest and try only those factual issues where there is a genuine dispute.

We dare say that in this case there is an ocean of facts based on *uncontradicted evidence* from the criminal and civil trials which may be stipulated to because either one side or the other has no evidence to contradict it or reasonable grounds to oppose it. For example, the parties

should be able to agree what various witnesses would testify to if called, and the precise nature of the cause of death of Nicole Simpson and Ron Goldman (if not *who* actually committed the crime). Transcripts are available from both the criminal and civil trials which will allow the court, like the trial court in *Guardianship of Smith, supra,* 147 Cal.App.2d 686, to examine vast amounts of evidence relatively quickly.

### B.  *Other Issues*

### 1.  *Domestic Violence*

### a.  *Nicole's Diaries*

■ The guardians tried to put certain entries from the mother's diaries into evidence on the domestic violence issue. In times past the entries would have been considered hearsay, but in 1996 the Legislature enacted section 1370 of the Evidence Code to provide that threats of physical abuse would not be excluded as hearsay if the statement evidencing the threat "was made at or near the time of the infliction or threat of physical injury." The statute became effective September 4, 1996. (Stats. 1996, ch. 416, § 2.) The trial judge, however, excluded the diary entries by holding that any threats in them referred to financial rather than physical threats.

Strictly speaking, the trial court's determination bore on the relevancy of the diaries rather than their hearsay nature. However, the threats were sufficiently ambiguous as to whether they referred to physical violence—as distinct from the metaphorical violence of litigation—that the entries still should have been admitted with each side permitted to argue its particular interpretation of them.[19]

The irony here is that there is a clear statement of legislative intent as to the purpose of Evidence Code section 1370. (See *J.A. Jones Construction Co.*

---

[19]In an amicus curiae brief submitted in support of Simpson's petition for rehearing, the Public Defender's Office of Los Angeles County argues that we cannot disagree with the trial court's evidentiary ruling regarding Nicole's diaries. The public defenders focus on the standard of review of all preliminary foundational findings resulting from the procedure provided in section 405, subdivision (a) of the Evidence Code. However, Evidence Code section 405 only spells out the procedure for questions of preliminary facts relating to the *reliability* or *competency* of the proffered evidence. For preliminary facts relating to the *relevancy* of the proffered evidence, Evidence Code section 403 provides the appropriate procedure. (See Assembly Com. on Judiciary com., 29B West's Ann. Evid. Code (1995 ed.) § 403, p. 361.) By its terms, section 403 applies to the situation involving a murder victim's diaries detailing domestic violence. (Evid. Code, § 403, subd. (a)(4) ["The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself."].) Here, as we are about to show, whatever the entries in *these* diaries, the *Legislature* determined that they were relevant to the domestic violence alleged between Nicole Brown Simpson and O. J. Simpson. Hence the existence of the "preliminary fact"—the relevance to domestic violence—was clearly

v. *Superior Court* (1994) 27 Cal.App.4th 1568, 1579 [33 Cal.Rptr.2d 206] [courts should look to legislative history when it is clear on particular point].)

Indeed, it is about as clear as is imaginable, because section 1370 of the Evidence Code was enacted specifically in response to the fact that these very diaries could not come into evidence in the criminal trial! (See arguments in support of Assem. Bill No. 2068 (1995-1996 Reg. Sess.) for hearings of Aug. 14, 1996 ["The most notable recent example of this deficiency in California law is the exclusion of hearsay statements made by Nichole [*sic*] Brown to her diary and to others, describing threats and physical abuses by Orenthal Simpson"] and Aug. 20, 1996 ["Nicole Brown Simpson made statements in her diaries and to friends in order to tell the world who her possible future murderer might be. She probably did not know that an archaic legal rule would keep a jury from hearing this relevant evidence."].) Under the circumstances, it is plain that the diaries should have been admitted as evidence, and the parties then allowed to argue as to what weight and interpretation to put on them. And, of course, given the diaries' direct relevance to the issues of domestic violence and Simpson's ability to control his temper, it was prejudicial error for the court not to allow them in.

### b. *Incidents of Violence Against Simpson's First Wife*

The guardians were not allowed to introduce evidence of Simpson's violence against his first wife, Marguerite, during the period prior to 1975. Because of the remoteness in time, the trial judge was within her discretion to exclude the evidence. This is not to say, however, that given a proper showing the trial judge might not act within the proper bounds of his or her discretion in admitting the evidence. Domestic violence is always a serious concern, and any propensity to it is certainly highly relevant as regards children's welfare.

### c. *The Overheard Phone Conversation*

The guardians were also not allowed to introduce the evidence of a witness who allegedly overheard Simpson shouting on the phone to Nicole. Given that the witness could only hear one side of the conversation and would not be able to provide a complete context for the conversation, we must agree again that the trial judge was within her discretion to exclude the proffered testimony.

---

established *in this case*. By the same token, however, our comments on the diary issue must necessarily be restricted to the facts in this case. It is the rare case indeed where the Legislature amends the hearsay rule with a specific item of evidence in mind, and a court must later determine the existence of the preliminary fact of the relevance of that very evidence.

## 2.  *The Request to Remove Minors' Counsel*

■ During the trial the guardians made a motion to remove the minors' court-appointed counsel on the ground that Sydney had voiced misgivings about the counsel appointed for her on no less than six different occasions from July to November 1996. We give this issue short shrift. Even assuming, for the sake of argument, that the guardians had standing to bring their motion, they point to nothing in particular which would *compel* the trial court to grant the motion. Just because one party does not think that the lawyer for another party is doing a good job for that party is no reason to remove the lawyer. The trial court's decision on the removal request is thus not among our grounds for reversal.[20]

## IV.  DISPOSITION

### A.  *Factors Which the Court Must Take Into Consideration on Remand*

Because the trial court excluded evidence of whether Simpson killed the children's mother, and also clearly erred in excluding evidence bearing on the domestic violence issue in the mother's diaries, the case must be remanded for another hearing. Before the trial court can legitimately terminate this guardianship it must first determine the most salient fact bearing on why the guardianship was created in the first place.

We are not unmindful of the difficult task we hand the trial court. That task was compounded by the failure of the Browns' attorneys to seek a stay of the termination of the guardianship when the trial court made its determination, and so the very passage of time itself is now a factor which the court, on remand, must take into consideration in making its determination. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 414-422 [33 Cal.Rptr.2d 85, 878 P.2d 1297] [dealing with existing bonds in context of juvenile dependency proceeding].)[21]

In addition, not only must the court give due respect and weight to the evidence bearing on the murder issue, it must consider a number of other factors as well, including any propensity toward domestic violence on Simpson's part in light of the evidence on the murder issue, the possible uprooting effect on the children if they are removed from Simpson's custody, the positive effects on them of continuing (or, more precisely because

---

[20]On remand, the minors' counsel can request, pursuant to Probate Code section 1470, fees for her work on this appeal.

[21]On the other hand, the mere fact of the passage of time should not be dispositive either. Time cannot be used to legitimate retroactively an erroneous custody decision, at least when the underlying facts show the potential for danger to the children. (Cf. *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531 [65 Cal.Rptr.2d 495] [bonds to present caretaker cannot be dispositive lest there be a "self-fulfilling prophecy"].)

there was no request to stay the termination, resuming) the guardianship, and the children's own views.[22]

B.   *Possible Referral to the Relevant Social Service Agency on Remand*

In *In re Sylvia R., supra,* 55 Cal.App.4th 559, 562, this court joined *In re Heather A.* (1996) 52 Cal.App.4th 183, 195 [60 Cal.Rptr.2d 315], in noting the obvious: Domestic violence against a spouse is detrimental to children. Indeed, a few years earlier, in *In re Benjamin D., supra,* 227 Cal.App.3d 1464, 1470, this court declared that evidence of spousal abuse could properly be considered by a juvenile dependency court in determining whether to bring children within its jurisdiction.

This court regularly sees juvenile dependency cases, like *In re Sylvia R.* and *In re Benjamin D.,* where domestic violence is an important factor. And domestic violence clearly was a major issue in the case before us, even if one were to discount wholly the murder evidence. In addition, Simpson was the subject of a long period of incarceration in the county jail pending the outcome of his criminal trial. Such facts typically prompt social worker intervention. (Cf. *In re Brittany S.* (1993) 17 Cal.App.4th 1399 [22 Cal.Rptr.2d 50].)

It is thus highly anomalous, to put the matter mildly, that in this case the relevant social service agencies—either those of Los Angeles or Orange County—chose to do nothing. We are not privy to the reasons for the conspicuous absence of intervention in a case which—if it did not involve a celebrity—would, in our experience, have routinely resulted in the filing of a dependency petition. Perhaps there are good reasons for the social service agencies' inactivity which do not appear before us; or perhaps there are none. In any event, we may observe that the juvenile dependency system was set up to protect the children of celebrities and the rich, as well as those of the nonfamous and the nonrich.

By the same token, an unintended consequence of this failure to act on the part of the social service agencies has been to posture this case as pitting the grandparents against the children's father. While the question is not before us, there may be other family members or potential caretakers better suited to look after the children's best interests. We express no opinion or preference on this subject other than to observe that the trial court was limited to deciding which of only two parties would have custody of Sydney and Justin. On remand, both court and counsel should explore all avenues which might tend to an arrangement best suited to these children.

---

[22]The children are now old enough to express their own preference, which also should be taken into account along with the other evidence in the case. Sydney was born in October 1985, and is now 13. Justin was born in August 1988 and is now 10. (See *In re Jack H.* (1980) 106 Cal.App.3d 257, 269 [165 Cal.Rptr. 646] [noting that trial judge's "firsthand impression" of the preferences of two children, thirteen and eight, "would have proven invaluable"].)

This court does not know what findings will be made on remand. Without speculating unduly, we merely point out that if the court finds that Simpson himself is not, in the totality of circumstances, so fit as to require termination of the guardianship, but it still decides, for some reason, that the Browns' guardianship should be terminated, referral to the social service agency *may* be an appropriate option.[23] Beyond that we need say no more.

### C.   *Reassignment on Remand*

■   Finally, because the case is to be remanded, we must address the issue of the removal of Commissioner Schulte and the reassignment of the case to Judge Stock. We are aware of no statute or rule of procedure which allows a presiding judge of a superior court to remove a court commissioner, already otherwise validly hearing a case, without finding good cause to do so.

Rule 205(6) of the California Rules of Court certainly doesn't qualify. That rule provides that the presiding judge shall "reassign cases from a department to another department as convenience or necessity requires."

California Rules of Court, rule 205(6) manifestly does not allow a trial court presiding judge to pull a case from a judge *after* trial has begun; otherwise it would give presiding judges license to attempt to affect *outcomes* by replacing judges whose rulings they may not like. It was obviously intended as a traffic control or "housekeeping" device to equalize assignments among judges who may have cases which are "trailing" or about to come to trial. And in any event it certainly cannot justify changing judges in the case before us, because nothing in the record even remotely shows "convenience"—much less "necessity." Here, it was manifestly *inconvenient* to the parties and the court to remove Commissioner Schulte and for Judge Stock to duplicate at least some of the effort that had already been put into the case.

Most dispositively, though, any interpretation of California Rules of Court, rule 205(6) which would allow a presiding judge to change judges after a trial began on mere "convenience" would contravene the state Constitution, which provides that when a member of the bar is sworn as a temporary judge pursuant to the stipulation of the parties—as was the case here—he or she "is empowered to act *until final determination of the cause*." (Cal. Const., art. VI, § 21, italics added.) If mere convenience were enough to justify removal of a judge after trial has begun, the constitutional empowerment of a commissioner to act until final determination could easily be

---

[23]Certainly social worker intervention would have been justified at the time of Simpson's arrest. Had that course been taken, in all likelihood the ensuing service plan would have dealt with the domestic violence issue. A court considering returning Sydney and Justin to Simpson today would then have a better grasp on whether any tendency to violence on his part would have been overcome.

rendered a dead letter. The bottom line is that it was not proper to unilaterally and without cause remove Commissioner Schulte from the case. Accordingly, on remand, we direct that further proceedings be heard before Commissioner Schulte.[24] (Code Civ. Proc., § 170.1, subd. (c) [on its own motion an appellate court may direct, in the interests of justice, "that further proceedings be heard before a trial judge other than the judge whose judgment . . . was reviewed by the appellate court"]; cf. Code Civ. Proc., § 187 [court has all means necessary to carry its jurisdiction into effect by suitable process or mode of proceeding most conformable to spirit of code].)

The Browns will recover their costs on appeal.

Crosby, J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied December 7, 1998, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied February 24, 1999.

---

[24]It is possible, of course, that given current assignments and workloads, Commissioner Schulte may not have sufficient time to devote to the case, and *he* may choose to ask the presiding judge to reassign it. But because the case was properly assigned to him initially, that is his call to make, based on his workload.