Filed 7/29/13  In re J.G. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | B244684 (Los Angeles County Super. Ct. No. CK93807) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.G., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Zeke Zeidler, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, David Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

D.G. (mother) appeals from the juvenile court's findings in connection with the jurisdictional and dispositional orders regarding her minor children, seven-year-old J.G. and one-year-old R.R., whom the juvenile court held to be dependent children of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b).[1] Mother contends that there is not substantial evidence to support the juvenile court's findings. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

On June 6, 2012, plaintiff and respondent Department of Family and Children's Services (Department) filed a detention report stating that on June 1, 2012, the Federal Bureau of Investigation (FBI), Los Angeles County Sheriff's Department (Sheriff's Department), and Pasadena Police Department executed a search and arrest warrant at the home of mother and M.R. (R-father), mother's boyfriend and biological father of R.R. Mother and R-father were the "targets" of the warrant. Law enforcement contacted the Department and requested that an independent investigation be conducted into allegations of felony child endangerment.

The June 6, 2012, detention report stated that a Children's Social Worker (CSW) arrived at the family home and spoke with the investigating officer, Pasadena Police Department Detective Duran, who stated that both mother and R-father were suspects "involved in major narcotic sales" and have been indicted by the federal government. Detective Duran stated that mother and R-father were arrested, and during the search of the home, gun ammunition and a gun case were found. Detective Duran stated that "mother reported not knowing where the gun was located and reported that the gun should be inside the case." The Department reported that, "According to Det. Duran, the gun was recovered, but he reported that the details of the case will soon be revealed.

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

2

However, at the current time only limited information could be provided by law enforcement to the Department."

According to the June 6, 2012, detention report, CSW spoke to mother and was only able to obtain from her identifying information about mother and the two children; mother refused to speak with the CSW any further. R.R. was taken into protective custody, and the Department placed R.R. with his maternal great aunt.

The CSW spoke with Jason G. (father), who stated that he is the biological father of J.G. Father informed the CSW that he had been married to mother for six years, they were in the process of divorcing, he and mother shared custody of J.G., J.G. does not spend the night at mother's home, and J.G. only visits with mother for a few hours at a time. Father stated that mother did not follow the family court's visitation orders, never asked for J.G. to spend the night at her house, and father "suspects that [mother] knows that it's best for [J.G.] not to be around her home." J.G. said that he lives with his father and grandmother, "[s]ometimes" goes to mother's house," and "sometimes" spends the night at mother's house, "but not too often."

The June 6, 2012, detention report stated that a CSW went to the Altadena Sheriff's station and met with Detective Ventigan who said that R-father was an active member of a criminal street gang, the *Pasadena Denver Lane* Bloods (Denver Lanes), is "a shot caller" for this gang, and has been an active participant in narcotic trafficking. Detective Ventigan also stated that in January 2012 a police report was filed concerning domestic violence. Detective Ventigan stated that according to the report, mother had suffered a "busted lip" for which she received stitches. Mother informed a nurse that R-father had caused the injuries to her lips. When law enforcement became involved, however, mother denied being a victim of domestic violence.

The police report prepared by the Sheriff's Department regarding the domestic violence incident was attached to the June 6, 2012, detention report. The police report stated that mother had gone to the hospital for injuries sustained to her face. Nurse Sherman asked mother what had happened, and mother replied her boyfriend pushed her to the ground causing her to hit her mouth on the ground. Mother subsequently told a

3

nurse practitioner treating her that she had sustained her injuries because she slipped and fell. Nurse Sherman believed mother was not being truthful about the cause of her injuries and felt she had to report the incident. Mother received four stitches to her lip and was discharged. Sheriff's Department deputies arrived at mother's home later that day and reported that mother had swelling to her upper left cheek and left side of her upper head. They noticed mother was "very uncomfortable" having them in her home, and several objects in mother's home appeared to have been "thrown around." Mother told the officers that she cut her lip when she slipped and fell, hitting her face on the arm of a couch. Mother showed the officers the couch. The officers observed that due to the amount of padding on the arm of the couch "it would almost be impossible to sustain those type[s] of injuries." The officers took photographs of mother's injuries.

According to the June 6, 2012, detention report, R-father suffered a sustained criminal charge for carrying a loaded firearm in 1994, and criminal convictions for assault in 1995, battery in 1997, and assault in 1998, the latter of which R-father was sentenced to 12 years in prison. R-father was also arrested in 1995 for possession of a narcotic controlled substance, in 1996 for possession of marijuana, and in 2011 for a parole violation.

On June 6, 2012, the Department filed a section 300 petition on behalf of J.G. and R.R., based on the domestic violence incident as well as the detrimental home environment created for the children by mother and R-father. At the detention hearing, mother and R-father did not appear because they were in federal custody. The juvenile court found a prima facie case for detaining the children and that they were minors described by section 300, subdivisions (a) and (b). The juvenile court ordered J.G. released to father's custody, and R.R. detained with the maternal great aunt.

On July 25, 2012, the Department filed a jurisdiction/disposition report stating that the Department interviewed mother at the Metropolitan Detention Center. Regarding the domestic violence incident, mother stated that she suffered the injuries to her lip when she slipped with R.R. in her arms, the nurse who reported the abuse was "inappropriate," and the law enforcement officers knew R-father and were trying "to get him in trouble."

4

Regarding the ammunition and missing gun, mother stated that she was a registered gun owner. J.G. denied seeing any guns in the home. J.G said he saw "shooting rounds," but could not clarify what they were.

According to the July 25, 2012, jurisdiction/disposition report, the maternal great aunt said that in the past she has seen mother with "two black eyes." She said that mother "wouldn't admit to it [domestic violence] at first. [Mother] would say things like a door hit or she was working with a dog." The maternal great aunt said that at one point mother nearly left R-father but then changed her mind.

The July 25, 2012, jurisdiction/disposition report provided that Altadena Sheriff's Department Sergeant Fender said that there had been a 21-month investigation into mother and R-father's drug activities resulting in their federal indictment for distributing drugs, R-father is a documented member of the criminal street gang—the Denver Lanes, and R-father had his two "baby mamas," including mother, distribute drugs for him.

According to the July 25, 2012, jurisdiction/disposition report, Pasadena Police Department Detective Cordova said, "'When [R.R.] was in the womb, her parents were dealing large amounts of crack cocaine. [R-father] ended up in state custody for a time and was in custody at the time [R.R.] was born. . . . The day both were arrested, no narcotics were recovered [in the home], but [R-father] was seen climbing out of the bathroom window. We are confident there were drugs in the home, but [R-father] flushed them when we showed up. Ammunition was also recovered in the home. . . . [Mother] was doing deliveries for [R-father]. I don't know if she brought the baby with her when she did that." Mother's paternal cousin told Department that she knew mother was transporting drugs before R.R. was born.

The July 25, 2012, jurisdiction/disposition report provided that on June 27, 2012, R-father's parole officer stated on May 25, 2011, that R-father had a parole violation for being associated with a gang, and on May 31, 2012, after having "maxed out on parole," he was discharged from parole and an indictment was served the following day.

Department determined that father had adequately protected J.G., and mother stated that "she would like [father] to have full custody of [J.G.] and feels he is an

5

excellent father to the child, [J.G.]" The Department recommended that the juvenile court close J.G.'s case with a family law order giving father full legal and physical custody of J.G. The Department recommended that R.R. remain placed in her maternal great aunt's house while mother and R-father completed their family reunification services.

A federal indictment filed on May 24, 2012, against mother, R-father, and several other individuals involved in drug trafficking was attached to the July 25, 2012, jurisdiction/disposition report. The federal indictment detailed numerous sales transactions and communications between the named defendants and federal authorities acting undercover, starting in October 2010, and continuing through approximately May 2011.

On July 25, 2012, the Department filed a supplemental report providing that R-father denied any incidents of domestic violence and R-father stated his parole officer would have deemed his parole to be violated had he physically abused mother. The dependency investigator observed a Denver Lanes tattoo on R-father's arm, but R-father stated he no longer was involved with the gang.

The parents wanted R.R placed with the paternal grandmother and paternal aunt who had been visiting R.R. The Department reported that although R.R had experienced trauma from being removed from her parents, she had been with the maternal great aunt for months and had bonded with the maternal great aunt. The maternal great aunt had ensured R.R. had visits with J.G., and her family, including the paternal side of her family. The Department indicated there were no identifiable issues why R.R should be moved, and on July 5, 2012, the maternal great aunt's home had an Adoptions and Safe Families Act (42 U.S.C. § 670 et seq.) clearance.

At the September 4, 2012, adjudication and disposition hearing, the juvenile court found the counts in the petition to be true and that J.G. and R.R. were minors described by section 300, subdivisions (a) and (b). The sustained counts (a)(l), (b)(2) in the petition read as follows: "The children [J.G.] and [R.R.]'s mother, . . . and the mother's male companion [R-father] father of [R.R.], have a history of engaging in a violent altercation.

6

On 01-27-12, [R-father] pushed the mother to the ground causing the mother to hit the mother's face and mouth on the ground sustaining a bleeding laceration to the mother's lip requiring stitches and swelling to the mother's cheek and lip. The mother failed to protect the children in that the mother allowed the [R-father] to reside in the children's home and to have unlimited access to the children. Such violent conduct on the part of the [R-father] against the mother and the mother's failure to protect the children endangers the children's physical health and safety and places the children at risk of physical harm, damage, danger and failure to protect."

The sustained count (b)(1) in the petition read as follows: "The children [J.G.] and [R.R.]'s mother, . . . and the mother's male companion [R-father] father of [R.R.], created a detrimental and endangering home environment for the children in that [R-father] and mother possessed ammunition in the children's home within access of the children. Such a detrimental and endangering home environment established for the children by [R-father] and the mother endangers the children's physical health, safety and well being and places the children at risk of physical harm and damage."

Regarding disposition, mother did not object to the court terminating jurisdiction over J.G., but requested joint legal and physical custody of him. Mother also asked that R.R. be returned to her custody so that she could make an appropriate plan for R.R.'s care. The juvenile court declared J.G. and R.R. dependents of the court, offered family reunification services for mother and R-father, ordered R.R. removed from parental custody and placed her with her paternal grandmother, and upon receipt of the family law custody order granting father legal and physical custody of J.G., terminated jurisdiction over J.G. on September 6, 2012.[2]

---

[2] Mother appealed the "September 4, 2012 jurisdiction and disposition findings . . . ." An appeal cannot be taken directly from a dependency court's jurisdictional order; the jurisdictional order is "appealable by way of a challenge to a dispositional order made subsequent to it." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1754.) We grant mother's request that we liberally construe her notice of appeal to include the September 6, 2012, custody order. (Cal. Rules of Court, rules 8.405(a)(3), 8.406.(d); *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450-1451.)

## DISCUSSION

In this appeal R-father is not challenging the jurisdictional findings. Mother contends that there is not substantial evidence to support the juvenile court's jurisdictional findings that J.G. and R.R. are dependent children of the juvenile court pursuant to section 300, subdivisions (a) and (b). Mother's appeal is nonjusticiable, and even if the appeal is justiciable, we hold that mother's substantial evidence contention is not meritorious.

### A.    Justiciability

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

"[I]t is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child. [Citations.] Once the child is found to be endangered in the manner described by one of the subdivisions of section 300[,] the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred. [Citation.] For jurisdictional purposes, it is irrelevant which parent created those circumstances. A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established. [Citation.] As a result, it is commonly said that a jurisdictional finding involving one parent is '"good against both. More accurately, the minor is a dependent if the actions of either parent bring [the minor] within one of the statutory definitions of a dependent."' [Citation.] For this reason, an appellate court may decline to address the evidentiary support for any remaining

8

jurisdictional findings once a single finding has been found to be supported by the evidence.  (E.g., *In re Alexis E.*[, *supra*,] 171 Cal.App.4th [at p.] 451 [90 Cal.Rptr.3d 44] [addressing remaining findings only '[f]or [f]ather's benefit']; *In re Joshua G.* [(2005)] 129 Cal.App.4th [189,] 202 [when a jurisdictional allegation involving one parent is found supported, it is 'irrelevant' whether remaining allegations are supported]; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 [79 Cal.Rptr.2d 922] [declining to address remaining allegations after one allegation found supported], superseded by statute on other grounds as stated in *In re Christopher C.* (2010) 182 Cal.App.4th 73, 82; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72 [74 Cal.Rptr.2d 770] [same].)" (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492.)

When "issues raised in [an] appeal present no genuine challenge to the court's assumption of dependency jurisdiction[,] . . . any order we enter will have no practical impact on the pending dependency proceeding, thereby precluding a grant of effective relief.  For that reason, we find [such an] appeal to be nonjusticiable." (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1491.)  "The many aspects of the justiciability doctrine in California were summarized in *Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450 [246 P.2d 688]:  "'A judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition.  . . .  [A]s a general rule it is not within the function of the court to act upon or decide a moot question or speculative, theoretical or abstract question or proposition, or a purely academic question, or to give an advisory opinion on such a question or proposition. . . .'" (*Id.* at pp. 452-453.)  An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status.  ""It is this court's duty '"to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."''""" [Citations.]" (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1490.)

The juvenile court found that it had jurisdiction over J.G. and R.R. based on the petition allegations under section 300, subdivisions (a) and (b). Father is not a party to this appeal. Mother's appeal therefore is nonjusticiable. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1491.)

Mother requests that we reach the merits of her challenge because the findings of jurisdiction as to her could be prejudicial because they could potentially impact the current or future dependency proceedings and family law proceedings, including all visitation orders between mother R.R., and future placement and reunification with mother, as evidenced by the juvenile court's removal of R.R. from her. Mother however does not challenge the orders removing R.R. from her custody or granting father legal and physical custody of J.G. Mother's contention is conclusionary and speculative, and she does not develop it further. As the court explained in *People v. Stanley* (1995) 10 Cal.4th 764, 793, it is not the role of a reviewing court to independently seek out support for appellant's conclusory assertions, and such contentions may be rejected without consideration. (See also *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 ["It is not our responsibility to develop an appellant's argument"]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].)

## B. Substantial Evidence

Assuming the justiciability of mother's contention that there is not substantial evidence to support the juvenile court's jurisdictional findings that J.G. and R.R. are dependent children of the juvenile court pursuant to section 300, subdivisions (a) and (b), we alternatively hold that it is not meritorious.

On appeal, we review the juvenile court's finding of jurisdiction for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) "The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]" (*Ibid.*) "The issue of sufficiency of the evidence in dependency cases

is governed by the same rules that apply to other appeals." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) An appellate court does not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. (*Ibid.*; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564 [issues of fact and credibility are questions for the trier of fact].) Instead, the reviewing court draws all reasonable inferences in support of the juvenile court's findings, considers the record most favorably to the juvenile court's order, and affirms the order if it is supported by substantial evidence even if other evidence supports a contrary conclusion. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947.)

The juvenile court found that J.G. and R.R. are dependent children of the juvenile court pursuant to section 300, subdivisions (a) and (b). Section 300, subdivisions (a) and (b) provides in pertinent part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm. [¶] (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the failure or inability of the parent or guardian to adequately supervise or protect the child. . ., or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

"In *In re Sylvia R.* [(1997)] 55 Cal.App.4th 559, 562, this court joined *In re Heather A.* (1996) 52 Cal.App.4th 183, 195 [60 Cal.Rptr.2d 315], in noting the obvious: Domestic violence against a spouse is detrimental to children. Indeed, a few years earlier, in *In re Benjamin D.* [(1991)] 227 Cal.App.3d 1464, 1470, this court declared that

11

evidence of spousal abuse could properly be considered by a juvenile dependency court in determining whether to bring children within its jurisdiction." (*Guardianship of Simpson* (1998) 67 Cal.App.4th 914, 940.) "Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b). Our colleagues in Division One of this appellate district have thoroughly explained the relationship between section 300, subdivision (b) and domestic violence: "'[D]omestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' [Citation.]'" (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.)

Mother contends the children were not at risk of harm from the allegations of domestic violence because she denied the allegations, the children did not witness it, and there were no other reports of domestic violence. She relies on *In re Daisy H.* (2011) 192 Cal.App.4th 713. Mother's reliance on that case is misplaced. In *In re Daisy H.*, *supra*, 192 Cal.App.4th 713, the court found that an incident of domestic violence that "happened at least two, and probably seven, years before the [Department] filed the petition," without evidence that the children were "physically exposed to the past violence between their parents or of any ongoing violence between the parents" who were then separated, did not place the children at risk of harm. (*Id*. at p. 717.)

Here, unlike in *In re Daisy H.*, the incident of domestic violence specifically referred to in the petition occurred six months before the petition was filed. Mother informed a nurse that R-father pushed her to the ground causing her to hit her mouth on the ground. Sheriff's Department deputies observed that several objects in mother's home appeared to have been "thrown around. The injuries were sufficiently serious as to require mother to seek treatment at a hospital, and she received multiple stitches to her lip. In addition, the maternal great aunt reported having seen mother with two "black eyes" in the past, and mother almost left R-father but then changed her mind. Although mother ultimately denied being a victim of domestic violence concerning the injuries to her lips—claiming that she slipped and fell— and did not admit being abused when she suffered the two black eyes—claiming that "a door hit her or she was working with a

12

dog," and R-father denied there had been any incidents of domestic violence with mother reasoning that his parole officer would have violated his parole had he physically abused mother, it was reasonable for the juvenile court to infer that mother was a victim of domestic abuse.

In addition to the domestic violence, mother and R-father had created a detrimental home environment for the children. The federal agents who conducted a search of the family home found ammunition and a gun case, but "mother reported not knowing where the gun was located . . . ." J.G. said he saw "shooting rounds."

The FBI followed R-father and mother's drug transactions and communications for 21 months, and Detective Cordova believed there were drugs in the family home, but R-father "flushed them" when law enforcement arrived to serve the search warrant. Mother exposed the children to R-father who had an extensive criminal history. R-father was a known gang member, and like mother, was federally indicted on drug trafficking charges. Father also informed the Department that he shared custody of J.G. with mother but she did not follow the custody agreement, and he believed this was because mother was cognizant that her home environment was not suitable for J.G.

There is substantial evidence to support the juvenile court's order.

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:


TURNER, P J.


KUMAR, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.